UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| BOXCAST INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Action No. 2:21-cv-00217 |
| v. | § | |
| | § | **PUBLIC REDACTED VERSION** |
| RESI MEDIA LLC, PUSHPAY, INC., | § | |
| AND PUSHPAY HOLDINGS LTD. | § | |
| | § | |
| Defendants. | § | |

---

### RESI MEDIA LLC'S OPPOSITION TO BOXCAST INC.'S
### MOTION FOR PRELIMINARY INJUNCTION

---

Michael C. Wilson
S. Wallace Dunwoody
Chase A. Cobern
MUNCK WILSON MANDALA LLP
12770 Coit Road, Suite 600
Dallas, Texas 75251
(972) 628-3600
(972) 628-3616 fax
mwilson@munckwilson.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.   THERE IS NO CLEAR SHOWING OF INFRINGEMENT OR VALIDITY ...................... 4

    A.   BoxCast's Uncorroborated Attorney Argument Is Not A "Clear Showing." ................... 4

    B.   BoxCast's Patents Are Not Infringed. ........................................................................ 5

        1.   BoxCast's infringement theory fails as a matter of law ........................................... 5

        2.   BoxCast's infringement theory is further avoided by Resi's modified products. ..... 7

    C.   BoxCast's Patents Are Headed For Invalidation. ........................................................ 9

        1.   The claimed invention was on sale before the critical date ..................................... 9

        2.   The claims are facially ineligible for patenting ..................................................... 10

        3.   Resi's pending IPR petition further demonstrates invalidity under § 103. ............ 12

II.   THERE IS NO CLEAR SHOWING OF IRREPARABLE HARM. .................................... 14

    A.   Resi's Design Changes Moot BoxCast's Motion. ....................................................... 14

    B.   There Is No Foundation For BoxCast's "Market." ..................................................... 15

    C.   There Is No Competent Evidence Of Causal Nexus. .................................................. 17

        1.   There is no evidence that patented features drive demand for Resi's products. ..... 17

        2.   Harm caused by Resi's partnerships is not caused by infringement. ...................... 21

        3.   Harm caused by market saturation is not caused by infringement ......................... 22

    D.   BoxCast's Alleged Harms Are Speculative, Calculable, Or Both. ............................... 24

        1.   Market share and customers ................................................................................... 24

        2.   Reputation and goodwill ........................................................................................ 27

    E.   BoxCast's Delay Negates Any Supposed Harm. ........................................................ 28

III.   THE EQUITIES FAVOR RESI. ...................................................................................... 29

CONCLUSION .................................................................................................................... 30

i

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Abbott Labs. v. Sandoz, Inc.*,
   500 F. Supp. 2d 807 (N.D. Ill. 2007) .......................................................................27

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
   324 F. Supp. 3d 470 (D. Del. 2018)...........................................................................7

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
   797 F.3d 1020 (Fed. Cir. 2015) (en banc)................................................................5, 6

*Alice Corp. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)..................................................................................................11

*Amato v. Elicker*,
   460 F. Supp. 3d 202 (D. Conn. 2020) .......................................................................4

*Hoffman-La Roche Inc. v. Cobalt Pharms. Inc.*,
   No. 07-4539 (SRC)(MAS), 2010 WL 4687839 (D.N.J. Nov. 10, 2010)...............27

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   678 F.3d 1314 (Fed. Cir. 2012) ("*Apple I*")................................................18, 20, 25, 29

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   695 F.3d 1370 (Fed. Cir. 2012) ("*Apple II*") ..........................................14, 19, 22, 25

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   735 F.3d 1352 (Fed. Cir. 2013) ("*Apple III*") .................................................17, 18

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   809 F.3d 633 (Fed. Cir. 2015) ("*Apple IV*") .........................................................15

*Automated Merch. Sys., Inc. v. Crane Co.*,
   357 F. App'x 297 (Fed. Cir. 2009) .....................................................18, 25, 26, 27

*Bayer Intellectual Prop. GmbH v. CAP IM Supply, Inc.*,
   No. 17-cv-591-RGA, 2018 WL 1517688 (D. Del. Mar. 28, 2018) ........................24

*Boire v. Pilot Freight Carriers, Inc.*,
   515 F.2d 1185 (5th Cir. 1975) .................................................................................29

*BuzzBallz, LLC v. JEM Beverage Co., LLC*,
   No. 3:15-CV-588-L, 2015 WL 3948757 (N.D. Tex. June 26, 2015) ......................29

*Centillion Data Sys., LLC v. Qwest Comm'ns Int'l, Inc.*,
   631 F.3d 1279 (Fed. Cir. 2011).........................................................................7, 8, 13

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) ................................................................................10

*Dennis Melancon, Inc. v. City of New Orleans*,
   703 F.3d 262 (5th Cir. 2012) .................................................................................24

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ..........................................................................................3, 18

*Eli Lilly v. Los Angeles Biomedical Res. Inst.*,
   849 F.3d 1073 (Fed. Cir. 2017) ..............................................................................13

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*,
   No. 18 Civ. 5290 (CM), 2018 WL 4360792 (S.D.N.Y. Sept. 5, 2018) ....................4

*Genband US LLC v. Metaswitch Networks Corp.*,
   No. 2:14-CV-00033-JRG, 2018 WL 11357619 (E.D. Tex. Mar. 22, 2018)................... *passim*

*In re Gleave*,
   560 F.3d 1331 (Fed. Cir. 2009) ..............................................................................13

*Gryphon Oilfield Sols., LLC v. Stage Completions (USA) Corp.*,
   No. H-17-3220, 2018 WL 447364 (S.D. Tex. Jan. 17, 2018)..................................17

*High Tech Med. Instr., Inc. v. New Image Indus., Inc.*,
   49 F.3d 1551 (Fed. Cir. 1995)................................................................................28

*Ill. Tool Works, Inc. v. Grip-Pak, Inc*,
   906 F.2d 679 (Fed. Cir. 1990)................................................................................30

*Int'l Data Grp. v. Ziff Davis Media, Inc.*,
   145 F. Supp. 2d 422 (D. Del. 2001)........................................................................30

*Interface, Inc. v. J&J Indus., Inc.*,
   No. 4:13-cv-47-WSD, 2013 WL 5945336 (N.D. Ga. 2013)......................................4

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*,
   No. 09-C-916, 2011 WL 62100 (E.D. Wis. Jan. 7, 2011) ................................15, 18

*Kryphon, Inc. v. Disc-O-Tech Med. Techs., Ltd.*,
   No. Civ.A.04-204 JJF, 2004 WL 2898064 (D. Del. Dec. 10, 2004) ........................4

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
   734 F.3d 1361 (Fed. Cir. 2013)................................................................................4

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997).................................................................................................3

*McDavid Knee Guard, Inc. v. Nike USA, Inc.,*
    683 F. Supp. 2d 740 (N.D. Ill. 2010) ...................................................................15

*Metalcraft of Mayville, Inc. v. The Toro Co.,*
    848 F.3d 1358 (Fed. Cir. 2017)............................................................................25

*Minerva Surgical, Inc. v. Holigic, Inc.,*
    No. 3:17-cv-02013-JD, 2018 WL 306689 (N.D. Cal. Jan. 5, 2018)............................25, 29

*Monsanto Co. v. Geerston Seed Farms,*
    561 U.S. 139 (2010).......................................................................................3, 28

*Novozymes A/S v. Danisco A/S,*
    No. 10-cv-251-bbc, 2010 WL 3783682 (W.D. Wis. Sept. 24, 2010) .............................29

*Nutrition 21 v. United States,*
    930 F.2d 867 (Fed. Cir. 1991)...........................................................................25, 28

*Omega Patents, LLC v. CalAmp Corp.,*
    920 F.3d 1337 (Fed. Cir. 2019)............................................................................5, 7

*Parshall v. HCSB Fin. Corp.,*
    No. 4:17-CV-01589-RBH, 2017 WL 3130479 (D.S.C. July 24, 2017) ...........................30

*Pfaff v. Wells Elecs., Inc.,*
    525 U.S. 55 (1998).........................................................................................9, 10

*Precision Links Inc. v. USA Prods. Grp., Inc.,*
    No. 3:08cv576, 2009 WL 3076114 (W.D.N.C. Sept. 22, 2009)..............................28, 29

*Pruvit Ventures, Inc. v. Forevergreen Int'l LLC,*
    No. 4:15-CV-571-ALM-CAN, 2015 WL 9876952 (E.D. Tex. Dec. 23, 2015) ............. *passim*

*Roper Corp. v. Litton Systems, Inc.,*
    757 F.2d 1266 (Fed. Cir. 1985)............................................................................14

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.,*
    No. 07-190-SLR, 2008 WL 114361 (D. Del. Jan. 8, 2008)......................................27

*Slide Fire Sols., L.P. v. Bump Fire Sys., LLC,*
    No. 3:14-cv-3358-M, 2016 WL 3361552 (N.D. Tex. Apr. 14, 2016) .............................25, 26

*Synopsys Inc. v. Mentor Graphics Corp.,*
    839 F.3d 1138 (Fed. Cir. 2016)............................................................................11

*TAOS, Inc. v. Renesas Elecs. Am.,*
    No. 4:08-cv-00451, 2019 WL 4805916 (E.D. Tex. Oct. 1, 2019)..................................14, 15

*Titan Tire Corp. v. Case New Holland, Inc.*,
566 F.3d 1372 (Fed. Cir. 2006) ..............................................................................4

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
748 F.3d 1159 (Fed. Cir. 2014) ..............................................................................17

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953) ................................................................................................14

*Vertigo Media, Inc. v. Earbuds Inc.*,
No. 21-120 (MN), 2021 WL 4806410 (D. Del. Oct. 14, 2021) ..............................4

*Wavetronix LLC v. Iteris, Inc.*,
No. A-14-CA-970-SS, 2015 WL 300726 (W.D. Tex. Jan. 22, 2015) ..............26, 28

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................ *passim*

*York v. Tex. A&M Univ. 12th Man Found.*,
No. 2:15-cv-352-JRG, 2015 WL 13306497 (E.D. Tex. Mar. 14, 2015) ..................3

## Statutes

35 U.S.C. § 101 ................................................................................................ *passim*

35 U.S.C. § 102(b) ...............................................................................................2, 9

35 U.S.C. § 103 ................................................................................................ *passim*

## Other Authorities

WRIGHT & MILLER § 2949 (3d ed. 2021) ....................................................................4

**Note**

All quoted emphasis is added unless otherwise indicated.

## INTRODUCTION

BoxCast is not entitled to the extraordinary remedy it seeks—an injunction preventing a competitor from selling to new customers through trial—for at least the following reasons.

**No Infringement:** BoxCast's reliance on attorney argument instead of POSA testimony precludes any "clear showing" of infringement and is reason enough to deny the motion. On the merits, BoxCast's infringement theory: (i) fails to identify a single act of direct infringement whereby *Resi* (as opposed to Resi's *customers*) completes every element of the asserted claims; and (ii) requires construing "data relating to a *recording start time*" to encompass on-off *operating states* that BoxCast expressly distinguished during prosecution. Regardless, recent changes to Resi's products—including those already in the field—go so far as to employ the *opposite* sequence of network communications purportedly covered by BoxCast's patent, thereby eliminating the only alleged infringement BoxCast's motion seeks to enjoin.

**No Validity:** BoxCast's patents are invalid under at least §§ 101, 102, and 103. Resi's pending 12(b)(6) motion shows that the facial ineligibility of BoxCast's claims is not merely a "substantial question," but warrants dismissing the entire case. Resi's pending IPR petitions demonstrate that the claims are also obvious in view of the prior art. And recent discovery confirms that BoxCast's patents likely violate the on-sale bar provision. None of these challenges "lack substantial merit."

**No Harm:** BoxCast cannot show anything resembling immediate, irreparable harm because: (i) Resi's modified products eliminate the possibility of future infringement; (ii) BoxCast's alleged "market" is unsubstantiated and contrary to reality; (iii) BoxCast presents no competent evidence of causal nexus; and (iv) BoxCast's alleged "harms" are speculative, compensable with money, and undermined by BoxCast's unreasonable delay in seeking relief. By contrast, Resi's injuries if enjoined are obvious and severe. BoxCast's motion is meritless and should be denied.

## BACKGROUND

BoxCast's motion asserts only the '574 patent, Mot.19,[1] which describes "[c]omputer-implemented systems and methods" for "autonomous broadcasting" of "video and audio data during an event" that can be scheduled "in advance and from a remote location (i.e., over a network)." '574 patent at Abstract. The only claims at issue are 1 and 12. Mot.19. Both recite an "autonomous broadcast device" or "ABD" situated "behind a router" that "autonomously" initiates a "request" to a "server" or "scheduling logic" that transmits "data relating to a recording start time" back to the ABD "in response to the request." As BoxCast acknowledges, the patent's "most central problem" was a "barrier to remote scheduling posed by network devices such as routers and firewalls," Dkt. #44 at 20, which it solved "by initiating all intra-system communications from the ABD *inside* the router or firewall." *Id.* at 8 (emphasis BoxCast's).

Resi's accused infringing products ("AIPs") include both hardware and software solutions used to livestream video to remote locations. Jones ¶7. All AIPs use Resi's patented "Resilient Streaming Protocol" or "RSP," which employs data-verification and retransmission techniques to ensure delivery of all audio and video content without quality loss regardless of network interruptions. Martel ¶3. Traditional streaming solutions use Forward Error Correction (FEC), Real-Time Messaging Protocol (RTMP), and buffer/latency techniques that do not guarantee the same error-free content delivery and reliability over unstable networks. Martel ¶3. Resi's namesake *Resi*lient Streaming Protocol is the key driver of demand for Resi's products and the primary market differentiator for Resi's streaming solutions. Martel ¶¶3, 21-23; Jones ¶6; Tyler ¶11(c). It

---

[1]   "Mot." refers to BoxCast's motion for preliminary injunction (Dkt. #47). "Mot.Ex.__" refers to the exhibits attached to BoxCast's declarations, which are cited as "Spaulding ¶__" and "Malkiewicz ¶__". "Opp.Ex.__" refers to the exhibits attached to Resi's declarations, which are cited as "Easttom ¶__", "Tyler ¶__", "Martel ¶__", "Jones ¶__", "Reitmeyer ¶__", and "Dunwoody ¶__." "Easttom IPR ¶__" refers to a declaration filed in support of Resi's IPR petitions, which is attached as Opp.Ex.F-4.

is the robustness of RSP, and the quality and reliability of the video streams it produces, that have won Resi a loyal customer following and Streaming Media's 2021 Reader's Choice Award for the best "Live Streaming Service," beating out dozens of larger and established competitors like Amazon Web Services. *See* Jones ¶¶4-5; Opp.Ex.B-1 (Streaming Media Awards); Martel ¶¶21-23; Opp.Ex.A-6, A-7 (Resi survey results and customer reviews). Resi has historically derived most of its revenue from medium to large multi-site churches that broadcast sermons live from a main campus to satellite campuses, including over 70 of the Outreach 100 Largest Churches in America. Jones ¶7; Tyler ¶18.

## ARGUMENT

An injunction is "strong medicine," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), "drastic and extraordinary" relief, *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 165 (2010), and not presumptively available even if infringement is proven at trial. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391-92 (2006). To obtain a *preliminary* injunction, BoxCast "must establish that **[1]** [it] is likely to succeed on the merits, **[2]** that [it] is likely to suffer irreparable harm in the absence of preliminary relief, **[3]** that the balance of equities tips in [its] favor, and **[4]** that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "[T]he requirement for substantial proof is much higher" for preliminary injunctions than for summary judgment, and "should not be granted unless the movant, *by a **clear showing***, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *accord York v. Tex. A&M Univ. 12th Man Found.*, No. 2:15-cv-352-JRG, 2015 WL 13306497, at *1 (E.D. Tex. Mar. 14, 2015) (Gilstrap, J.) (preliminary injunctions "should only be granted if the plaintiffs have ***clearly*** carried the burden of persuasion on all four requirements").

## I.   THERE IS NO CLEAR SHOWING OF INFRINGEMENT OR VALIDITY.

"[L]ikelihood of success" in a patent case means that BoxCast "must show that it will likely prove infringement, *and* that it will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2006). Resi need only "rais[e] a substantial question concerning either infringement or validity" to defeat the motion. *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1366 (Fed. Cir. 2013).

### A.   BoxCast's Uncorroborated Attorney Argument Is Not A "Clear Showing."

The motion should be denied at the outset because BoxCast's reliance on attorney argument instead of POSA testimony precludes it from making any "clear showing" of infringement and validity. *Winter*, 555 U.S. at 22. "To make such a 'clear showing,'" the movant "must put forth *evidence* supporting its claims," as "neither attorney argument nor the allegations in the complaints suffice." *Vertigo Media, Inc. v. Earbuds Inc.*, No. 21-120 (MN), 2021 WL 4806410, at *5-6 (D. Del. Oct. 14, 2021).[2] Courts have repeatedly rejected likelihood-of-success arguments predicated on attorney argument without POSA support.[3]

---

[2]   *See also* 11A WRIGHT & MILLER § 2949 at 237 (3d ed. 2021) ("Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction."); *Amato v. Elicker*, 460 F. Supp. 3d 202, 214 n.6 (D. Conn. 2020) ("The Court cannot rely on factual representations in the parties' briefs to decide a motion for a preliminary injunction[.]").

[3]   *See, e.g.*, *Vertigo*, 2021 WL 4806410, at *5-6 (finding "[a]ttorney argument … insufficient to meet the moving party's burden of persuasion … with respect to infringement" because patentee "provided no expert (or other) testimony and no authenticated documents to demonstrate infringement, instead presenting claim charts"); *Interface, Inc. v. J&J Indus., Inc.*, No. 4:13-cv-47-WSD, 2013 WL 5945336, at *2-3 (N.D. Ga. 2013) ("Plaintiffs' Claim Chart … and attorney argument purporting to show how [its] descriptions correspond to the elements of claim 20" was "not evidence, and the Court does not consider it" and thus "Plaintiffs [] failed to submit any evidence showing that [the accused products] infringe"); *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, No. 18 Civ. 5290 (CM), 2018 WL 4360792, at *3 (S.D.N.Y. Sept. 5, 2018) ("The failure by [patentee] to offer any testimony from [a POSA] to rebut [defendant]'s argument means that [patentee] has not shown that [defendant]'s defense to a claim of infringement 'lacks substantial merit.'"); *Kryphon, Inc. v. Disc-O-Tech Med. Techs., Ltd.*, No. Civ.A.04-204 JJF, 2004 WL 2898064, at *3 (D. Del. Dec. 10, 2004) (patentee could not show invalidity challenge lacked merit because it "[did] not presen[t] any expert testimony, but rather relie[d] on attorney argument, to refute [defendant's] [invalidity] argument based [on] the [prior art] reference").

Despite characterizing the relevant "technology" as "anything-but straightforward or simple," Mot.29, BoxCast's motion provides no expert or other POSA testimony to support its infringement and validity arguments. Instead, BoxCast relies on claim charts from its infringement contentions (cited **25 times**, Mot.20-23) and attorney arguments regarding: (i) "the operation of Resi's products and services," Mot.20; (ii) whether the AIPs "ha[ve] the same tri-component distributed architecture as BoxCast's patent claims," Mot.21; (iii) whether the prior art "alone or in combination, disclos[e] the claimed three-component broadcast system," Mot.25; (iv) whether "a POS[A]" would know or "have [] reason to look to" certain information, Mot.28; and (v) the "inventiveness of the claimed combination" and whether its components were "generic, routine[,] or conventional." Mot.29-30. By contrast, Resi has submitted uncontroverted expert testimony on these issues.[4] BoxCast's failure to carry its initial burden warrants denial of the motion.

### B.  BoxCast's Patents Are Not Infringed.

#### 1.  BoxCast's infringement theory fails as a matter of law.

The only infringement theory BoxCast's motion asserts against Resi is "direct infringement" through Resi's alleged "*sale* of the Resi ABDs and its streaming services." Mot.24. This requires proof that "'*all of the elements* of the claim[s] are *present in the accused systems*' allegedly sold" by Resi. *Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1345 (Fed. Cir. 2019); *see also Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc) ("Direct infringement under § 271(a) occurs where *all steps* of a claimed method are performed by or attributable to a *single entity*.").[5]

---

4   *See generally* Opp.Ex.D (12/06/2021 Easttom Decl.); Opp.Ex.F-4 (10/15/2021 Easttom IPR Decl.).

5   This is not a situation where the patentee has alleged or otherwise attempted to show *divided* infringement, whereby one entity can be "responsible for others' performance of [the] method steps" if it "directs or controls others' performance" or "the actors form a joint enterprise." *Akamai*, 797 F.3d at 1022. BoxCast does not assert divided infringement in its PR 3-1 infringement contentions.

BoxCast does not even attempt to make this showing. Far from demonstrating that *Resi* sells a product or performs a method completing every element of claims 1 and 12, BoxCast admits that several claim elements must be completed by third-party "*customers*" or "*users*," including the elements of "situating [an ABD] behind a router"[6] (as required by claims 1.1 and 12.1) and "set[ing] a recording start time for a live event"[7] (as required by claim 12.4). BoxCast's motion does not even address the element of "transmit[ting] [data] … **without modification or circumvention of the router** [or *firewall*]" (as required by claims 1.3 and 12.5), which must also be completed by customers and their respective routers/firewalls. But marketing materials cited by BoxCast show that Resi actually "recommends" that customers **modify** their network and firewall settings to prioritize encoder and decoder traffic.[8] Reitmeyer ¶8; Easttom ¶¶112-115.

It is black-letter law that the completion of a claimed system or method by a defendant's *customers* cannot support direct infringement by the *defendant*—particularly when the claim elements are, as BoxCast emphasizes here, "distributed" over a network.[9] Mot.2-3, 19, 21, 26, 29.

---

6   *See, e.g.*, Mot.20 ("Resi's **customers** purchase the Resi ABDs and connect them to their local networks (behind a firewall or router) where they wish to record a live event."); Mot.21-22 ("These devices are purchased by Resi **customer** [sic] and installed in their local network, which is typically always behind a router and/or firewall.").

7   *See, e.g.*, Mot.19 ("In operation, the process starts with a **user** providing information to the scheduling server regarding the start of a live event to broadcast."); Mot.20 ("Resi provides a separate web application, which it calls 'Control,' through which the **user** can control the Resi ABDs from any location over the internet…. This includes the ability to set recording and broadcasting schedules for the Resi ABDs[.]"); Mot.21 ("In operation, the Resi ABDs and related services work as follows. A **user** at any time can log on to Control and set a schedule for broadcasting[.]").

8   Ex. L to BoxCast's Compl. (Dkt. #1-13) at 2 ("[S]etting up your network properly takes a crucial role in how you stream with Resi."); *id.* ("Additional recommendations are made by Resi to ensure a proper configuration with specific network setups."); *id.* at 3 ("Resi recommends providing encoders and decoders with specific IP addresses through mac-based IP reservation (configured with a router or DHCP server), and prioritizing all traffic to and from those IP addresses over other network traffic. At a minimum, reserve the recommended bandwidth … for each Encoder and Decoder on the network.").

9   *See, e.g.*, *Omega*, 920 F.3d at 1345 (claims requiring transmission of data to and from "cell tower" were not "satisfied by [defendant] selling its systems" because defendant was "not alleged to provide the cell tower"); *Centillion Data Sys., LLC v. Qwest Comm'ns Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed.

---

BoxCast thus cannot show direct infringement, which necessarily precludes it from showing induced infringement.[10] Mot.23-24. *See Omega*, 920 F.3d at 1345 ("[L]iability for inducement must be predicated on direct infringement."). Because BoxCast's infringement theories cannot succeed *as a matter of law*, BoxCast's likelihood of success on the merits is *zero*.

### 2.   BoxCast's infringement theory is further avoided by Resi's modified products.

BoxCast contends that Resi encoders, by polling a remote server for an *operating state* (*e.g.*, "start" or "stop"), satisfy the claims' requirement to "request" and "receive" "data relating to a recording start time." Mot.22-23; Mot.Ex.C-49 at 2-3, 13-14. Before the Patent Office, however, BoxCast insisted that the "data related to a recording start time" requested and received by the ABD must include "*schedule* data" or "*schedule*-related data." Opp.Ex.F-7 at 10-11; Opp.Ex.F-8 at 33-34. BoxCast thus distinguished transmissions that do *not* include "schedule" data. The prior Markman Order BoxCast cites[11] does not support, and in fact rejects, BoxCast's attempt to broaden this term to encompass anything less than *schedule* data.[12]

---

Cir. 2011) (no direct infringement where "[t]he customer, not [defendant], complete[d] the system by providing the [claimed] 'personal computer data processing means' and installing the client software"); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 481 (D. Del. 2018) ("Just as 'user' action was required by the final claim element in *Centillion*, action by multiple customers is required here for the claimed 'participants' to be in place and to send data in the network.").

10  BoxCast alleges induced infringement only against Pushpay, Inc., and Pushpay Holdings Ltd. (collectively, the "Pushpay Entities"). Mot.23-24. The Pushpay Entities have not appeared in this case.

11  The 2/21/2020 Markman Order issued more than a year after BoxCast and YSL had already settled. Instead of informing the court of their 1/14/2019 settlement, and thereby mooting the 18 disputed claim terms that necessitated Judge Beaverstock's 84-page Order, BoxCast and YSL jointly moved to stay discovery pending the court's construction of those terms and represented that "the effect of claim construction on all facets of this case" was "good cause" for a stay. Opp.Ex.F-13 at 1. In fact, BoxCast and YSL had already agreed to ███████████████████████ Mot.Ex.C-4 at 4 (settlement agreement).

12  Mot.Ex.C-3 at 58 ("Because BoxCast linked the 'data relating to …,' 'schedule data,' and 'schedule-related data' to overcome prior art rejections due to obviousness concerns, *it would be improper to construe the claim term to encompass a broader meaning*."); *id.* ("The Court accepts YSL's proposition that 'data relating to …' in this instance necessarily corresponds to 'schedule data' and its other related terms.").

Regardless of how that term is ultimately construed in this case, Resi has already modified its AIPs—including all units leaving the factory and units already in the field (the "modified AIPs")—to foreclose any reasonable theory of infringement. Reitmeyer ¶¶3, 6. As confirmed by Resi's CTO and an technical expert, instead of ███████████████████, Resi's encoders now ████████████████████████████████████████ ████████████████████████████. Reitmeyer ¶¶4-7; Easttom ¶¶86-94. This change to a ████ system nullifies BoxCast's infringement theory because Resi devices do not "***issue a request*** … to a first server … and ***receive data*** relating to a recording start time of a live event from the first server ***in response to the request***" or "***transmit*** the digital content … based on the data relating to the recording start time," as required by claim 1. Nor do its servers transmit "***data*** relating to the recording start time" to the encoders "in response to ***a request initiated autonomously by the [encoders]***," or receive transmissions from encoders "based on the data relating to the recording start time," as required by claim 12. Easttom ¶¶95-111.

Critically, BoxCast distinguished this type of ██████ solution from its claims during prosecution to overcome a prior-art reference called Brown, asserting that Brown's server "unilaterally inform[ed]" an encoder to begin recording. Opp.Ex.F-8 at 10-11. The Examiner accepted BoxCast's argument and found that Brown disclosed "a server issuing a request for a recording start time and ***pushing*** recording time data to a broadcasting device"—not "a broadcasting device … which will autonomously ***issue a request*** for a recording start time to a server." Opp.Ex.F-9. ██████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████. Easttom ¶103. As BoxCast concedes, ██████████████████████ ████████████████████████████████████████████

████████████████████████████ This eliminates the possibility of *future* infringement, and moots BoxCast's request for injunctive relief. *See infra* §II.A.

### C. BoxCast's Patents Are Headed For Invalidation.

#### 1. The claimed invention was on sale before the critical date.

Recent discovery reveals that BoxCast's patents are likely invalid under § 102's on-sale bar. The Patent Act prohibits the patenting of any invention that was "on sale" in the United States more than one year before the application was filed. 35 U.S.C. § 102(b) (pre-AIA). The on-sale bar applies when, before that "critical date," the invention was (1) "the subject of a commercial offer for sale" and (2) "ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). The "ready for patenting" condition is satisfied by evidence of "reduction to practice" or that "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67-68.

The critical date of the '574 patent was March 11, 2009. BoxCast admits that "on or about May 29, 2008," an entity called Adelphus Solutions, LLC ("Adelphus"), which included the named inventors of the '574 patent, ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Opp.Ex.F-2 at 13-14. That same day, ██████████████████████████████████████████ *Id.* at 14. BoxCast admits that the "solution" Adelphus provided to Jenkins included a ████████████████████ ████████████████████████████████████████████████████████ ████████████ *Id.* While BoxCast contends that the full "solution" was not "***provided***" to Jenkins until ████████████████████—a mere three days after the critical date—the evidence shows that the solution was subject to "a commercial ***offer for sale***" before the critical

date. *Pfaff*, 525 U.S. at 67.[13] What BoxCast itself repeatedly describes as the invention's "three basic components" (Mot.19, 2, 3, 25) were all offered and described in writing to Jenkins in 2008, including: (1) an ABD placed at the location of a live event; (2) a scheduling server at a remote location; and (3) a media server. *See* Easttom ¶¶116-122; Opp.Ex.F-2 at 12-15. Because this evidence raises a substantial question of invalidity under the on-sale bar provision, the Court should deny preliminary injunctive relief.

### 2. The claims are facially ineligible for patenting.

As detailed in Resi's pending § 101 motion (Dkt. #35) and reply (Dkt. #50), BoxCast's claims are directed to the unpatentable abstract concept of "communicating *requests* to a remote server and *receiving* communications from that server." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). That the claims do not merely *involve* but are *directed to* this unpatentable concept is undisputed: BoxCast concedes that the claimed "solution" is precisely the same "sequence of communications" by which a device communicates "request[s]" to a server and "receive[s]" communications from that server "in response to the request." Dkt. #44 at 20-21. In five separate briefs addressing eligibility, Dkt. #17, 26, 44, 47, 52, BoxCast has yet to offer any persuasive reason why this concept is patent-eligible under binding Federal Circuit precedent.[14]

BoxCast's injunction motion purports to offer "evidence" that its "ABD" is "a unique, specialized component." Mot.29. But BoxCast offers no POSA testimony or other evidence addressing the conventionality of the "ABD" as *claimed*. BoxCast cites internal emails showing

---

13   BoxCast admits that Jenkins was successfully "using" the full "solution" in a commercial setting by March 25, 2009, Opp.Ex.F-2 at 15, indicating that the invention was "ready for patenting" well before the critical date. *Pfaff*, 525 U.S. at 67.

14   In addition, BoxCast's claims are patent-ineligible because they amount to nothing significantly more than the automation of longstanding human activity—namely, manually starting a live broadcast. *See, e.g.*, *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 219-20, 225-26 (2014) (prohibiting patent claims directed to "longstanding commercial practice[s]" applied using "unspecified, generic" technology).

the time and "effort" it took to design a *commercial embodiment* of the "ABD," with unclaimed "cutting-edge components" to "address critical issues such as physical footprint, heat dissipation, and status indicator[.]" Mot.29-30. The § 101 inquiry, however, "must focus on the language of the Asserted Claims themselves." *Synopsys Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016). The "ABD" as *claimed* requires no "cutting-edge components" and "address[es]" none of the "critical issues" identified in BoxCast's motion. Mot.29-30. Rather, in BoxCast's own words, the *claimed* ABD "is ***simply a device that transmits***." Opp.Ex.F-10 at 17.[15]

In addition to the arguments presented in Resi's pending 12(b)(6) motion, Dkt. #35 at 17-23, Dr. Easttom's declaration demonstrates that BoxCast's claimed request-response sequence has long been a fundamental practice and basic building block of network communications like accessing websites, checking emails, and downloading data—all of which involve client devices initiating requests to servers and receiving data in response. Easttom ¶¶67-78. Browsing the Internet and checking email in March 2009 was about as "well-understood, routine, and conventional" as it gets. Against that backdrop, BoxCast's patent says the claimed "ABD" can be a "general purpose desktop or laptop computer," 7:65-8:30, and that the "present invention" may be "implemented on … networked computer systems and stand-alone computer systems." 25:66-26:2. In short, the intrinsic and extrinsic evidence of ineligibility in this case far exceeds the "substantial question" threshold necessary to defeat BoxCast's motion.

---

**15**   *See also, e.g.*, Opp.Ex.F-10 at 17 ("That is BoxCast's construction and is all that is required of the broadcasting device in and of itself. Whether the word 'autonomous' is included or not has no bearing because the specification uses both 'autonomous broadcasting device' and just 'broadcasting device' to refer to the same device. In the specification, the two terms mean the same thing, and so too in the claims they mean the same thing: 'a device capable of transmitting live video data to a server.'").

### 3.   Resi's pending IPR petition further demonstrates invalidity under § 103.

Even if the claims could survive § 101, they face insurmountable § 103 problems. As detailed in Dr. Easttom's declaration and Resi's IPR petition (Opp.Ex.F-3), claims 1 and 12 are obvious in view of prior-art combinations including: (i) Allen (Mot.Ex.C-50) and Maes (Opp.Ex.F-5) with or without Horowitz (Opp.Ex.F-6) (Easttom IPR ¶¶216-267, 322-331); and (ii) Kim (Mot.Ex.C-51) and Maes (Easttom IPR ¶¶344-370). *See* Opp.Ex.F-3 at 31-51, 61-65, 67-79. These references confirm that BoxCast's "distributed architecture," hardware, and "sequence of communications" were ubiquitous in network technology before the critical date. Easttom IPR ¶¶46-85.

For example, Allen discloses an automated livestreaming system with a distributed architecture and the same "three basic components" of the claims identified by BoxCast (Mot.19):

(1) "[*M*]*ultimedia capture devices*" ("*MCDs*") (802, 804, 806) "*distributed throughout a network*" that "*access* a *schedule* that is either stored locally … or *on the control server*" and "execute a schedule" to "generate start and stop indicators to prompt" itself to "start and stop capturing and/or start and stop sending media signals" of, "for example, an *in-progress* classroom presentation."[16]

(2) A "*scheduler*" (830) (*e.g.*, "a *server* ... or a *remote* computer") that "contains the capture schedule" and "is configured to *transmit* the capture schedule … to the control server" when "the control server … *request*[*s*] one or more portions of the capture schedule from the external scheduler 830," and can also "*send* one or more portions of a capture schedule(s) to each of the multimedia capture devices."[17]

(3) "One or more *control servers*" (820) to which MCDs "*immediately* upload captured *content*" of "*media signals*" that are "made available for distribution" for "retrieval by a user from … the control server."[18]

---

[16]   Mot.Ex.C-50 at [1015], [1020], [1074]-[1075], [1082], Fig. 8. As explained in Resi's IPR petition, supported with expert testimony, a POSITA would understand "access" to indicate a request-response communication. Opp.Ex.F-3 at 21, 41; Easttom IPR ¶80. The prior art need not use the same words as recited in the claims to render them invalid. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). Courts consider both the literal teachings and inferences a skilled artisan could reasonably draw from a prior art reference. *Eli Lilly v. Los Angeles Biomedical Res. Inst.*, 849 F.3d 1073, 1074-75 (Fed. Cir. 2017).

[17]   Mot.Ex.C-50 at [1099]-[1101], Fig. 8.

[18]   Mot.Ex.C-50 at [1020]-[1024], [1074]-[1075], Fig. 8.

Maes, a secondary reference raised in Resi's IPR petition but ignored by BoxCast's motion, explicitly discloses type of network communications claimed by BoxCast: "***client devices*** … [that] can ***access*** desired information from a [***server***] system 1904 by connecting via … a ***router*** 1004,"[19] including with "***request-response protocol***[***s***]" like "HTTP," "SIP," and "RTP" that can pass "***end-to-end*** across the infrastructure (gateways and ***firewalls***)."[20] In view of Maes, if not the state of the art alone, a POSA would have understood Allen's MCD to "access a schedule" by which it receives and transmits live digital content *without modification or circumvention of the router*, as required by both BoxCast's claims. Easttom IPR ¶224-258.

Horowitz, another secondary reference raised in Resi's IPR petition and ignored by BoxCast, discloses "a ***client device*** 108" that "***transmits a request***" over "a ***network*** 109, such as the Internet" and an "[u]pdate ***server*** 154 [that] ***serves*** EPG update ***data***"—that is, data "used to update original ***start, stop and duration times***" for a "program that is ***scheduled*** to be recorded by a client device"—"***to any requesting client device*** 108."[21] Horowitz expressly teaches the use of this system for livestreaming: "the distribution of live content (e.g., content that was not previously stored, such as live feeds)."[22] Thus, the prior art clearly discloses each and every claim element in closely related applications. Easttom IPR ¶¶267, 331. Because the prior art raises substantial questions as to the validity of claims 1 and 12, BoxCast is not entitled to a preliminary injunction.[23]

---

**19** Opp.Ex.F-5 at [0180].

**20** Opp.Ex.F-5 at [0204], [0227]-[0229], [0232], [0311].

**21** Opp.Ex.F-6 at [0033], [0048], [0051].

**22** Opp.Ex.F-6 at [0041].

**23** BoxCast mischaracterizes Resi's reliance on the general knowledge of POSAs. Mot.28-29. There are no claim limitations "admittedly missing from the prior art" in any of Resi's obviousness combinations; nor does BoxCast point to any. Mot.28. Resi's IPR petitions assert that *notwithstanding disclosure* of every claim limitation in Resi's cited references, POSAs would have nonetheless found it obvious based on general knowledge to supply the limitations that were "unusually simple and … particularly straightforward," like situating a networked device behind a router, requesting and receiving data from servers, and the like. *See, e.g.*, Opp.Ex.F-3 at 15-31; Easttom IPR ¶¶49-74.

## II.  THERE IS NO CLEAR SHOWING OF IRREPARABLE HARM.

BoxCast also fails to make a "clear showing that it is at risk of irreparable harm," which requires "showing a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("*Apple II*").

### A.  Resi's Design Changes Moot BoxCast's Motion.

"The purpose of an injunction is to prevent *future* violations." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *accord TAOS, Inc. v. Renesas Elecs. Am.*, No. 4:08-cv-00451, 2019 WL 4805916, at *3 (E.D. Tex. Oct. 1, 2019) ("[I]njunctions are 'tools for *prospective* relief designed to alleviate *future* harm'"). Regardless of whether BoxCast "has cited … acts which, if proven, might constitute past infringement, there is nothing of record establishing *present* infringement or an *immediate* threat of renewed infringement." *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1273 (Fed. Cir. 1985) (emphasis in original). Rather, as explained above, *supra* §I.B.2, and set forth in declarations from Resi's Chief Technology Officer, Reitmeyer ¶¶3-7, and technical expert, Easttom ¶¶86-115, the modified AIPs eliminate any reasonable argument for future infringement. Because BoxCast's allegations of irreparable harm are predicated on "Resi's continued infringement," Mot.2, "evidence that [Resi] no longer sells an infringing product … doom[s] [BoxCast]'s assertion that it is irreparably harmed by continued infringement." *TAOS*, 2019 WL 4805916, at *4 (irreparable harm negated by uncontroverted declaration that alleged infringing activity ceased).[24] "In other words, if there is no infringement, then there can be no resulting irreparable harm to BoxCast." Tyler ¶93. "The unfortunate fact (for [BoxCast]) is that where there is more than one way to skin a cat, or [automate livestreaming], and a large market for such a

---

[24]   *See also, e.g.*, *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 748 (N.D. Ill. 2010) (same); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 09-C-916, 2011 WL 62100, at *4 (E.D. Wis. Jan. 7, 2011) (changes to product made injunction motion "essentially moot").

product, competitors are bound to continue to seek lawful ways of competing." *Kimberly-Clark*, 2011 WL 62100, at *3. As BoxCast is obviously "not entitled to an injunction barring [Resi] from competing," its motion should be denied. *Id.*; *see also Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 640 (Fed. Cir. 2015) ("*Apple IV*") (injunctions are "not entered on account of 'irreparable harm caused by otherwise lawful competition'").

## B.   There Is No Foundation For BoxCast's "Market."

BoxCast's motion is predicated on the existence of an "automated live-streaming church market" within which customers only want livestreaming with automated scheduling and "BoxCast and Resi are the two dominant players." Mot.16. This is pure fantasy.[25] It comes from the declaration BoxCast's VP of Finance, Peter Spaulding, who has since admitted in a deposition that that he in fact has *no* personal knowledge of:

- the size of the total market (Spaulding Tr.[26] 130:22-131:3);

- the share of the market BoxCast does not possess (134:14-21);

- the share of the market BoxCast has purportedly lost (159:19-23);

- whether other companies offer "automated scheduling functionality" (143:1-145:24);

- when Resi became BoxCast's "main direct competitor" (147:22-24);

- any scientific study of the market (136:18-137:7); or

- market research beyond "competitive intelligence and industry knowledge" (142:1-7).

Spaulding could not even *define* the "automated live-streaming church market," much less substantiate its existence or demonstrate his qualification for opining on it.[27] He claimed not to know whether the "automated live-streaming church market" was simply "made up for purposes

---

**25**   *See* Tyler ¶¶11(b), 27-45 (describing market conditions), 46-73 (describing participants and products), Fig. 3.2 (sources identifying 35 companies among "top" livestreaming products for churches).

**26**   "Spaulding Tr." refers to Peter Spaulding's 11/19/2021 deposition transcript, attached as Opp.Ex.F-1.

**27**   *See, e.g.*, Spaulding Tr. 138:10-139:6, 140:6-14, 152:17-21, 159:19-23. These revelations form the basis for the motion to strike Resi files concurrently with this opposition (Dkt. #56).

of this lawsuit." Spaulding Tr. 145:18-146:2.[28] And when asked about other opinions in his declaration, Spaulding mechanically repeated that "Resi sells an infringement product"[29] and that BoxCast is "losing customers to Resi" based on unspecified "industry knowledge and competitive intelligence."[30]

Although BoxCast cites additional testimony from economist Michal Malkiewicz regarding "the automated live-streaming church market" and its "four competitors," *see, e.g.*, Mot.9-10, 5-6, 15-17, Mr. Malkiewicz relies solely on *BoxCast* (*i.e.*, Spaulding) to identify this market and its competitors.[31] Mr. Malkiewicz's declaration offers no independent analysis or foundation for his opinion beyond the same unspecified "competitive intelligence and industry knowledge."[32] These "unsubstantiated opinions … ***are not evidence***[.]" *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-00033-JRG, 2018 WL 11357619, at *6 (E.D. Tex. Mar. 22, 2018) (Gilstrap, J.). In short, there is no support for BoxCast's make-believe market.

In reality, the relevant market is much broader, as explained by Resi's economics expert. "The notion BoxCast competes in essentially a two-player market with Resi is fiction" because "[d]ozens of livestreaming solutions compete for customers, including for the more than 300,000 church[es]" that use "at least **35** livestreaming solutions," many of which are free. Tyler ¶¶11(b), 56, 59-67 (surveying streaming competitors), Fig. 3.2 (listing sources identifying 35 companies

---

**28**   BoxCast's own website comparing itself to competitors, internal marketing "Battlecards" against competitors, and internal records of sales lost to competitors all confirm that BoxCast in fact has *many* competitors that would be excluded from the narrow market definition it presents here. Tyler ¶¶64-67; Opp.Ex.F-11 at 2, 5-12.

**29**   Spaulding repeated this line approximately 35 times at his deposition, despite conceding he does not know "what it is about the product that supposedly infringes or why." Spaulding Tr. 65:8-16.

**30**   *See, e.g.*, Spaulding Tr. 129:6-9, 139:7-14, 141:18-142:17, 147:3-14, 147:22-148:7, 155:13-19.

**31**   *See, e.g.*, Malkiewicz ¶¶53-54; Mot.1, 5, 9-10; *see also* Tyler ¶¶11(a) (observing Malkiewicz relied on Spaulding to define market and competitors), 51-56 (Spaulding's opinions on market and competition are conclusory and unfounded), 57-73 (discussing market participants and drivers of demand).

**32**   *See, e.g.*, Malkiewicz ¶¶53, 62.

among "top" livestreaming products for churches), 68-71 & Figs. 3.6-3.7 (identifying three dozen companies that "compete for church livestreaming," including at least 20 with automated scheduling capabilities); *see also* Martel ¶¶4-10 (describing livestreaming market and competitors for church customers); Jones ¶¶3-4.[33] Given the "similar products" offered by other "major competitors" in the "broader," properly-defined market, *Gryphon Oilfield Sols., LLC v. Stage Completions (USA) Corp.*, No. H-17-3220, 2018 WL 447364, at *4 (S.D. Tex. Jan. 17, 2018), there is no reasonable basis to conclude that an injunction would prevent the alleged harm to BoxCast.

### C.   There Is No Competent Evidence Of Causal Nexus.

BoxCast further fails to prove any connection between the alleged harms and alleged infringement.[34] Irreparable harm "cannot be shown if sales would be lost regardless of the infringing conduct"; BoxCast must "show that the infringement caused [the] harm in the first place." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*").

### 1.   There is no evidence that patented features drive demand for Resi's products.

Causal nexus requires evidence that the *patented feature* "is one of several features that cause consumers to make their purchasing decisions" or its "inclusion or absence … makes a product significantly more or less desirable." *Genband*, 2018 WL 11357619, at *2 (quoting *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1364, 1367 (Fed. Cir. 2013) ("*Apple III*"). This typically requires "survey evidence showing that the infringer's customers would be willing to pay a 'price premium' for a product with the claimed features." *Id.*  BoxCast presents no such evidence.

---

33   This is nothing like the "tiny market" for sod harvesters in *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014) (cited in Mot.16), where "opportunities to attract customers and make sales [were] scarce" and "a single lost sale [was] a sizeable percentage of the yearly market."

34   BoxCast's assertion "there is almost always irreparable harm" whenever "a patent is infringed" directly conflicts with the Supreme Court's rejection of that "categorical" approach in *eBay*. 547 U.S. at 394; *see also Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009) (*eBay* "discarded" the "presumption of irreparable harm, based just on proof of infringement").

*First*, generic references to "automated scheduling" in Resi's "marketing materials" is not enough. Mot.13. For one thing, BoxCast's premise that any reference to "automated scheduling" or even "automation" is synonymous with BoxCast's patented features is unsupported.[35] Resi's modified AIPs, *supra* §I.B.2, as well as its manual "single click" option for livestreaming, Tyler ¶92, further confirm that there are substantial non-infringing alternatives competing in the market. *See supra* §I.B.2. But even if references to automated scheduling were references to patented features, this Court has recognized that "sales documents that include descriptions about the patented feature in [an accused infringer's products] do not establish that [the patented] functionality drives consumer demand," as "[t]here is no *per se* rule that a feature drives consumer demand of a product simply because the feature is necessary or more useful in the operation of [a] product." *Genband*, 2018 WL 11357619, at *5. To the contrary, "automated scheduling" is a standard feature included in every "base plan"[36]; it is *not* a feature that "customers would be willing to pay a 'price premium' for," much less one that "significantly increases the price of a product." *Id.* at *6 (quoting *Apple III*, 735 F.3d at 1367).

*Second*, BoxCast's assertion that "Resi's customers [] cite automated scheduling as a valuable feature" is unsupported and similarly insufficient. Mot.13. BoxCast references just *one* purported "Resi customer" it says "praised Resi's automation" on a podcast stating he "love[s] automation" and "[i]t's nice with Resi to not have to think about" manually starting a livestream. Mot.13. But

---

[35] *See* Opp.Ex.F-2 at 5-6 (admitting 35% of current BoxCast customers on various streaming "plan[s]" "did not purchase BoxCast's Autonomous Broadcast Device (ABD) hardware"). According to BoxCast's expert, although none of these non-hardware customers "benefit from [the claimed] automated streaming/remote scheduling feature," Malkiewicz ¶26 n.49, they nonetheless benefit from an "automated scheduling" feature "included in all plans" sold by BoxCast. *Id.* at Table 2B note 1; *see also id.* ¶38 ("all four plans include automated, pre-set scheduling feature for live streaming").

[36] Spaulding Tr. 152:22-153:7 ("Q: Is [the automated streaming feature] something that's included as part of the basic plan, or is it an add-on, a premium feature that you charge extra for? A: I believe the automated scheduling functionality is part of base plans."); *compare* Mot.13 (Resi plan comparison), *with* Malkiewicz ¶38 & Table 2A (same for BoxCast).

even accepting (without granting) the flawed premise that all "automation" of livestreaming infringes BoxCast's patent, this anecdotal comment "at best reflec[t] an individual belief that [a] feature is important to [some] consumers," which "does not suffice to establish a causal nexus." *Apple II*, 695 F.3d at 1377; *see also id.* (same for "article [that] simply explains and praises [the patented] feature but says nothing about consumer demand"). A podcast discussing multiple features of Resi's products (primarily, RSP) "is not sufficient to establish that the patented feature is a bona fide driver of consumer demand[.]" *Genband*, 2018 WL 11357619, at *4.

*Third*, "evidence that [BoxCast's] own executives believe that [automated scheduling] functionality is important to their consumers" does not "establis[h] what [***Resi's***] customers believe or what drives *their* decisions to buy." *Id.* at *6 (emphasis in original). Critically, BoxCast's only cited executive has admitted he has no "personal knowledge regarding the reasons why *Resi's* customers choose their products." Spaulding Tr. 159:4-10.

*Fourth*, bare counts of customers BoxCast "lost to Resi" (Mot.15) prove nothing. Spaulding confirmed that BoxCast counted customers "lost" to Resi ████████████████████████ ███████████████████ Spaulding Tr. 70:20-74:22, while ignoring the overwhelming evidence that those customers' reasons for switching to Resi ████████████████████████████ have nothing to do with "automated scheduling."[37] Indeed, of roughly ████ "lost" customers for

---



[37] *See, e.g.*, Spaulding Tr. 79:2-15 ███████████████████; 80:5-22 ██████████████████████████████████; 81:24-82:8 ██████████████████████; 82:9-18 ██████████████████████████████; 83:6-11 ██████████████████████████████████████; 84:1-9 ███████████; 87:7-13 ██████████████████████████; 88:3-8 ██████.

whom BoxCast actually documented a reason for losing, *none* indicated a preference for Resi based on "automated scheduling." Tyler ¶¶11(d), 94-100; Tyler Attachment C (full list).[38]

*Fifth*, there is "considerable countervailing evidence indicating that [automated scheduling] was *not* a determinative factor in consumer decisionmaking." *Apple I*, 678 F.3d at 1324. As noted above, automated scheduling is a standard feature of both parties' base plans, and thus does not motivate consumer choices between the parties' product tiers, much less the parties themselves. Tyler ¶81. It is difficult to imagine why a consumer would purchase Resi's entry-level encoder for *more than three times* the price of BoxCast's for reasons related to a feature already included in BoxCast's base plan[39]—and otherwise available *for free*. Tyler ¶88; Martel ¶¶21, 24. As BoxCast's expert acknowledges, "products and services that deliver higher quality, better reliability, or improved ease of use and maintenance compared to existing alternatives in the marketplace should, all else being equal, support a higher price." Malkiewicz ¶30 n.56. That is the case here, where Resi's products are known for their superior streaming quality and reliability attributable to Resi's use of RSP.[40] Jones ¶¶5-6; Martel ¶¶21-25 (explaining that customers choose Resi for quality streaming, reliability, and customer support); Opp.Ex.A-6 (dozens of customer reviews confirming same); Opp.Ex.A-7 (dozens more customer reviews confirming same). As Dr. Tyler explains:

> Automated scheduling is not a driver of customer demand for livestreaming solutions generally – nor for Resi's solutions in particular. Instead, customers tend to choose (and pay a premium for) Resi because of the reported resiliency of its livestream (avoidance

---



40   *See* Resi, Resilient Streaming Protocol (RSP), https://resi.io/rsp/.

of pixilation or interruption) – the reliability and robustness of its Resilient Streaming Protocol (RSP) is the key differentiating factor for Resi.[41]

Even the consumers cited in BoxCast's motion expressly describe RSP as a "reason" they choose Resi.[42] ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████   Unlike the standard feature of automation, RSP differentiates Resi from its competitors and justifies its higher entry-level price. Tyler ¶11(c); Jones ¶6; Martel ¶¶6, 21-23.

## 2.   Harm caused by Resi's partnerships is not caused by infringement.

Causal nexus is also negated when there are "alternative reason(s)" for the alleged harm beyond infringement. *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, No. 4:15-CV-571-ALM-CAN, 2015 WL 9876952, at *7 (E.D. Tex. Dec. 23, 2015), *report and recommendation adopted*, No. 4:15-CV-571, 2016 WL 231160 (Jan. 19, 2016). Here, BoxCast does not suggest that Resi's alleged infringement *itself* has ever caused "substantial and immediate irreparable injury" warranting injunctive relief. *Apple II*, 695 F.3d at 1374. Indeed, BoxCast does not seek to enjoin Resi's alleged continued infringement with respect to existing customers. Mot.2. BoxCast instead attributes the *cause* of its alleged harm to (and seeks to enjoin the effect of) Resi's "partnerships[s]" with companies in other markets like Renewed Vision and Pushpay:

---

**41**   Tyler ¶¶11(c); *see also id.* ¶¶74-81 (automated scheduling does not drive demand for *BoxCast's* products), 82-92 (automated scheduling does not drive demand for *Resi's* products).

**42**   The podcast by the "Resi customer" BoxCast cites in Mot.13-14 comments that "when [he] think[s] of Resi, [] the **reason** [he] like[s] using it" is "the quality" of the live stream attributable to Resi's "**Resilient Streaming Protocol**," 3:23-10:58, which he labels "a what and a why for Resi." 30:25-35. The email from a "BoxCast customer" BoxCast cites in Mot.14 *begins* by stating that "[o]ne of the **reasons** we chose not to renew was *because* the company we chose to go with had a **Resilient Streaming Protocol** that helps with quality and video drops"—before mentioning "the capability to auto start the stream which will help us I believe." Mot.Ex.B-3. ████████████████████████ ████████████████████████████████████████████████████████

- BoxCast is "harmed from the negative impacts that Resi's *ProPresenter partnership* had on BoxCast's business" because "[*t*]*hat partnership* **enabled** Resi to leverage its infringing products to gain significant market share at BoxCast's expense" (Mot.10);

- [T]the *Pushpay partnership* will **cause** even greater, irreparable harm ████████ ████████████████████████████ (Mot.10);

- Resi and Pushpay "plan to … increase their market share **through** 'an *integration with Pushpay's sales and marketing engine*'" (Mot.10-11);

- "[O]ffering Resi's infringing product *as a bundle with Pushpay's church management software* **will likely provide** [the] extraordinary circumstances" it "takes … to lose a customer to a competitor" (Mot15);

- "Resi and Pushpay will lock in customers **by providing** a *holistic bells-and-whistles product offering*" (Mot. 15).[43]

BoxCast's VP of Finance agreed that ████████████████████████████████████

Spaulding Tr. 61:8-15. By contrast, he could not say ████████████████████████████

████████████████████ *id.* 65:4-16, much less whether it drives consumer demand for the

AIPs. Any harm (or fear of future harm) from *bundling* is a function of economics—not harm from

the use of patented features. Tyler ¶11(f) ("The claimed mechanism of harm – bundling of Resi

and Pushpay products – is not supported and inconsistent with basic economic principles.  If

bundling were to 'cause' any loss of sales to Resi … then as a matter of logic it is the bundling

leading to losses, not automated scheduling."). That the alleged infringement was admittedly not

enough to cause the alleged harm is fatal to BoxCast's motion for injunctive relief.

### 3.   Harm caused by market saturation is not caused by infringement.

BoxCast acknowledges that "live-streaming systems sales boomed" in the "spring of 2020"

as a direct result of temporary lockdowns "during the global COVID pandemic," Mot.5, and that

the market has since "saturate[d]." Mot.17; Malkiewicz ¶62. Yet BoxCast attempts to blame Resi

for ████████████████████████████ Mot.16, apparently believing that but for the

---

**43**   *See also, e.g.*, Mot.11 ("*Bundling* Resi's infringing products *with Pushpay's platform* is a direct threat to BoxCast's market share"); *id.* ("The surge in growth **initiated by** the *Resi-ProPresenter deal* is likely a mere fraction of what is to come from the *Resi-Pushpay partnership*.").

alleged infringement and "partnership[s]," BoxCast would have continued adding new customers at the unprecedented levels ██████████████████████ it experienced as a result of the pandemic.[44] Yet even BoxCast's expert concedes that ████████████████████ after the early stages of the pandemic ███████████████████████████████████████ ████████████[45] The flattening of demand for streaming services in the wake of a global pandemic is neither surprising nor unique to the church market. Tyler ¶¶11(g) ███████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████, 35-45 (COVID's impact on livestreaming generally and churches in particular), 109-120 (COVID's impact on BoxCast's church sales growth vs. non-church sales growth); Jones ¶14-16 (COVID's impact on Resi's sales and competition with BoxCast). ███████████████████████████████████████████████████████ ████████████████████████ Tyler ¶¶109-120; Jones ¶¶14-16. In short, the industry-wide waning of pandemic-induced demand cannot reasonably be attributed to Resi, much less Resi offering "automated scheduling."[46] Tyler ¶¶94-100. The Court should deny the injunction. *See, e.g., Genband*, 2018 WL 11357619, at *9 (denying injunction for lack of causal nexus alone).[47]

---

**44** ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

**45** ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████

**46** *See, e.g., Bayer Intellectual Prop. GmbH v. CAP IM Supply, Inc.*, No. 17-cv-591-RGA, 2018 WL 1517688, at *11 (D. Del. Mar. 28, 2018) (no causal nexus where "[t]he multi-competitor nature of the spot-on market, the general decline of spot-on products, and customer migration away from the pet specialty channel suggest that factors other than Defendant's product may be responsible for the decline in [Plaintiff's] sales").

**47** The weakness of BoxCast's nexus evidence is perhaps best illustrated by its expert's comparison of "counts" of internet "posts or articles" mentioning "BoxCast," "Resi," "and a range of keywords" with those mentioning "both BoxCast and Resi/Pushpay-related keywords," from which he deduces that "the alleged infringement helped Resi take the spotlight from BoxCast." Malkiewicz ¶¶77-81.

#### D.   BoxCast's Alleged Harms Are Speculative, Calculable, Or Both.

Regardless of their causal connection to patented features, BoxCast's alleged harms to "market share and customers" and "goodwill and reputation" (Mot.1) cannot justify injunctive relief because they are purely speculative and readily compensable with money. Allegations of "harm that *could* threaten BoxCast's ███████████████" (Mot.10) are not enough; BoxCast "must demonstrate a probability, not merely a possibility, of irreparable harm in the absence of an injunction." *Winter*, 555 U.S. at 24. "[A]n injury is *irreparable* only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). In other words, BoxCast must demonstrate that "no amount of monetary damages, however great, could address the harm" because "the injury cannot be quantified." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017).

#### 1.   Market share and customers

BoxCast's principal alleged "harm" relates to "los[ing] market share and customers." Mot.1, 8, 10-11, 15-18. "[L]ost market share *must be proven* (or at least *substantiated with some evidence*) in order for it to support entry of a preliminary injunction." *Automated Merch.*, 357 F. App'x at 301. Mere "speculation that [market share] losses might occur" cannot "amount to proof" of irreparable harm because "possible market share loss would apply in every patent case where the patentee practices the invention." *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991).

Spaulding does not actually know "what percentage of market share [] BoxCast lost to Resi," Spaulding Tr. 159:19-23, which is a problem for BoxCast. *See, e.g.*, *Pruvit*, 2015 WL 9876952, at *6 (rejecting market-share theory that failed to identify "what percentage of share has been lost"); *Slide Fire*, 2016 WL 3361552, at *2 (same). BoxCast's claim of lost *market share* really amount to de minimus lost *customers* that BoxCast itself has readily quantified. Mot.12 (asserting BoxCast



). [48] BoxCast even quantified the ███████ lost sales revenue associated with every lost customer ███████ ████████████████, Spaulding Tr. 70:20-76:18, foreclosing any contention that it "cannot be compensated by monetary damages." *Automated Merch.*, 357 F. App'x at 301. [49] Those "lost sales standing alone" are "insufficient to prove irreparable harm." *Id.* at 300-01. [50]

Additionally, BoxCast's alleged harm stemming from a purported Resi-Pushpay "bundle" is unfounded and unsubstantiated speculation. *See* Tyler ¶¶11(e), 11(h), 101-108 (analyzing impact of Pushpay's acquisition of Resi on BoxCast), 121-130 (analyzing impact of "bundling" on irreparable harm). BoxCast (*i.e.*, Spaulding) concedes that "it takes extraordinary circumstances to lose a customer to a competitor," but speculates that "offering Resi's infringing product as a bundle with Pushpay's church management software will likely provide such extraordinary circumstances." Mot.15 (citing Spaulding ¶21). Spaulding admitted he could not identify a single BoxCast customer ever "cancelling their services to switch to a Pushpay/Resi bundle," Spaulding Tr. 61:8-18, and has no personal knowledge concerning whether Resi and Pushpay have "ever"

---

[48]   Even granting the unfounded premise that BoxCast lost ██ (Mot.12) of its ██ "church" customers (Mot.4) to Resi because of an "automated scheduling" feature that BoxCast already offers, BoxCast's maximum loss of **less than** ███████ **percent** of *its own customers* says nothing about its loss of any share of *the market as a whole*, Tyler ¶¶11(g), 117-119, and cannot amount to a "clear showing" of "substantial and immediate irreparable injury." *Apple II*, 695 F.3d at 1374; *see also Apple I*, 678 F.3d at 1324-25 ("A mere showing that [the patentee] might lose some insubstantial market share as a result of [] infringement is not enough."); *Minerva Surgical, Inc. v. Holigic, Inc.*, No. 3:17-cv-02013-JD, 2018 WL 306689, at *5 (N.D. Cal. Jan. 5, 2018) ("handful of [lost] accounts" is insufficient).

[49]   *See, e.g.*, *Wavetronix LLC v. Iteris, Inc.*, No. A-14-CA-970-SS, 2015 WL 300726, at *8 (W.D. Tex. Jan. 22, 2015) (no irreparable harm where patentee "estimate[d] the total value of its lost sales, including th[ose] poached by [defendant]"); *Pruvit*, 2015 WL 9876952, at *7 (no irreparable harm where lost profits were "known or otherwise readily ascertainable").

[50]   Courts in the Eastern and Northern Districts of Texas have held that even "[p]roof of lost market share *and* lost sales alone are insufficient to establish irreparable harm." *Pruvit*, 2015 WL 9876952, at *6; *accord Slide Fire Sols., L.P. v. Bump Fire Sys., LLC*, No. 3:14-cv-3358-M, 2016 WL 3361552, at *2 (N.D. Tex. Apr. 14, 2016) ("Even if Plaintiff had established loss of market share or price erosion, such evidence would not be sufficient, without more, to establish irreparable harm.") (citing *Pruvit*).

offered "any bundling."[51] *Id.* at 62:3-6. He even conceded that BoxCast "ha[s]n't seen the effects of the purchase that Pushpay made of Resi," *id.* at 102:13-18, and that the only basis for his "extraordinary circumstances" opinion amounts to a single Pushpay email (announcing its acquisition of Resi) that supposedly went to ▓▓▓ BoxCast customers who are also Pushpay customers. *Id.* at 62:7-65:11, 45:13-18; Mot.Ex.B-5.[52] The mere possibility that some BoxCast customers who are also Pushpay customers might someday purchase an unidentified "bundle" from Resi and Pushpay if one ever becomes available is insufficient as a matter of law. *Winter*, 555 U.S. at 22  ("possibility of some remote future injury" is not irreparable harm); *cf. Automated Merch.*, 357 F. App'x at 301 (accused infringer's "acquisition of distribution company [that] placed [its] allegedly infringing machines in many of the same showrooms as [patentee's] machines" insufficient to prove irreparable lost market share).[53] BoxCast's allegations of "existential harm" ▓▓▓▓▓▓▓▓ based on such speculation are incredible. Mot.16.

Finally, BoxCast's "willingness to license the asserted patents" "suggests that any future damages could be calculated." *Pruvit*, 2015 WL 9876952, at *7. ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

**51**   In fact, there has been no bundling or integration of products and services between Resi and Pushpay; nor are there any near-term plans for Resi and Pushpay to merge and start offering bundled or integrated services—the companies have continued to operate separately. Martel ¶¶26-31.

**52**   Two recorded phone conversations with customers cited by BoxCast's expert indicate that even after receiving this email, both customers chose to *remain* with BoxCast. Mot.Ex.B-1, B-4.

**53**   Indeed, BoxCast could not prove irreparable harm even if it could prove that it was likely to lose ▓▓ of its entire *market share. Compare Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, No. 07-190-SLR, 2008 WL 114361, at *6 (D. Del. Jan. 8, 2008) ("**15%** loss of market share, without more, does not establish irreparable injury"), *with Abbott Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d 807, 843 (N.D. Ill. 2007) (evidence of "**90%** decline in market share" justified injunction); *and Hoffman-La Roche Inc. v. Cobalt Pharms. Inc.*, No. 07-4539 (SRC)(MAS), 2010 WL 4687839, at *11 (D.N.J. Nov. 10, 2010) (evidence competitor would cause patentee "to lose **50%** of its market share within weeks, and up to **90%** within months" justified injunction).

███████████ Malkiewicz ¶90.[54] ████████████████████████████████████

████████████████████████████████████████████████ [55] Opp.Ex.F-12 at 1.

It is therefore "clear that [BoxCast] is willing to forgo its patent rights for compensation." *High Tech Med. Instr., Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). That "a less drastic remedy [was] sufficient to redress [BoxCast's] injury" from another competitor's infringement demonstrates that "no recourse to the additional and extraordinary relief … of an injunction [is] warranted" here. *Monsanto*, 561 U.S. at 165–66.

### 2.   Reputation and goodwill

BoxCast's allegations of harm to its "reputation as an innovator" and "goodwill" are equally unfounded. Mot.17. A "showing of reputational harm must be concrete and corroborated, not merely speculative." *Pruvit*, 2015 WL 9876952, at *5. Unlike cases involving concrete harms to reputation or goodwill, BoxCast presents "no evidence th[at] [Resi's products are] an inferior or cut-rate version of [BoxCast's products], or that [Resi's] products are considered less innovative or prestigious than [BoxCast's]." *Wavetronix*, 2015 WL 300726, at *8 (rejecting similarly weak allegations of harm to patentee's asserted "reputation as an innovator" that had "invest[ed] heavily in research and development"). █████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ Such "speculative allegations of possible

---

[54] ████████████████████████████████████████████████████████████
████████████████████████████████████

[55] ████████████████████████████████████████████████████████████
████████████████████████

harm in the future" "conditioned on possible future events" are not enough. *Precision Links Inc. v. USA Prods. Grp., Inc.*, No. 3:08cv576, 2009 WL 3076114, at *8 (W.D.N.C. Sept. 22, 2009).

### E.   BoxCast's Delay Negates Any Supposed Harm.

Finally, BoxCast's substantial delay in bringing an infringement suit and seeking injunctive relief against Resi confirms that "the status quo does not irreparably damage [BoxCast]." *Nutrition 21*, 930 F.2d at 872; *see Apple I*, 678 F.3d at 1325 ("[D]elay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement."). According to its own expert, "BoxCast became aware of Resi's infringement on or around December 2020," Malkiewicz ¶67, yet did not assert that any alleged infringement "threaten[s] [its] ██████████████" with "existential harm" until nearly a year later.[56] Mot.16. Nor did BoxCast seek an injunction at the time it filed suit in June 2021, despite alleging in its complaint that it had already "suffered irreparable harm and will continue to suffer irreparable harm in the future unless Resi's infringing activities are enjoined." Dkt. #1 ¶¶60-61. BoxCast instead delayed *another 4.5 months* before moving for injunctive relief—such "a lack of urgency and irreparable harm" and "weigh[s] heavily against granting injunctive relief."[57]

---

**56**   BoxCast's delay since its first notice of the alleged infringement exceeds a year. BoxCast's internal records confirm it suspected infringement by Resi in ██████████, Opp.Ex.F-11 at 9; Dunwoody ¶12, and BoxCast's complaint asserts that the parties "initiated discussions" three months earlier. Dkt. #28 ¶45. At that time, BoxCast was complementary of Resi's products and actively courted Resi for a merger, without alleging infringement until late December 2020. Jones ¶¶17-20; Martel ¶¶11-16.

**57**   *Pruvit*, 2015 WL 9876952, at *8 (E.D. Tex.) (movant delayed **5 months** after notice) (E.D. Tex.); *see also, e.g., BuzzBallz, LLC v. JEM Beverage Co., LLC*, No. 3:15-CV-588-L, 2015 WL 3948757, at *7 (N.D. Tex. June 26, 2015) (**4 months** after notice and **2.5 months** after suit); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (**3 months** after notice); *Minerva*, 2018 WL 306689, at *6 (N.D. Cal.) (**9 months** after notice and **5 months** after suit); *Precision Links*, 2009 WL 3076114, at *8 (W.D.N.C.) (**5 months** after suit); *Novozymes A/S v. Danisco A/S*, No. 10-cv-251-bbc, 2010 WL 3783682, at *4 (W.D. Wis. Sept. 24, 2010) (**2 months** after suit).

## III.  THE EQUITIES FAVOR RESI.

"[C]ourts 'must balance the competing claims of injury'" and "should pay particular regard for the public consequences in employing the extraordinary remedy of [an] injunction." *Winter*, 555 U.S. at 24. Although the Court need not reach the third and fourth factors at all,[58] neither favor an injunction here. Whereas BoxCast's alleged reputational harm is illusory, the reputational harm to Resi is obvious if forced to "pause" (Mot.1) new customer sales.[59] Jones ¶12. Such an injunction would cause immediate damage to the stock price of Pushpay, a relatively small public company who has yet to make an appearance in this case, and whose shareholders now include Resi personnel.[60] Jones ¶¶9-13. It would cause lost profits to Resi of at least ███████. Jones ¶11.[61]

While an injunction "would advantage BoxCast and other competitors in the market," it would hurt customers who prefer "the differentiated products that Resi offers which focus primarily on reliability." Tyler ¶¶145, 11(j). It would also undermine the status quo of a "dynamic" market where "advancements and improvements" lead to "competition and customer churn" by "hamstring[ing Resi] while others gain at its expense." Tyler ¶¶146; 11(j). The public interest in "encouraging innovation" (Mot.18) is not remotely served by directly and drastically interfering with a business trying to help churches spread the Gospel through superior technology[62]—all for facially-invalid patent claims covering a ubiquitous feature that does not drive consumer demand.

---

58  *Pruvit*, 2015 WL 9876952, at *9 (courts "need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors").

59  *See Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990) ("hardship" on defendant "who must withdraw its product from the market before trial can be devastating").

60  *See, e.g.*, *Parshall v. HCSB Fin. Corp.*, No. 4:17-CV-01589-RBH, 2017 WL 3130479, at *7 (D.S.C. July 24, 2017) ("reduction in share value of [defendant's] stock" weighed against injunction)

61  ████████████████████████

62  *See, e.g.*, *Int'l Data Grp. v. Ziff Davis Media, Inc.*, 145 F. Supp. 2d 422, 441 (D. Del. 2001) ("[T]he public's interest is not served by taking a competitive and valuable product out of the marketplace.").

## CONCLUSION

For the foregoing reasons, the Court should deny BoxCast's motion (Dkt. #47).


Dated:  December 6, 2021                    Respectfully submitted,

                                            /s/ Chase A. Cobern
                                            Michael C. Wilson
                                            Texas Bar No. 21704590
                                            mwilson@munckwilson.com
                                            S. Wallace Dunwoody
                                            Texas Bar No. 24040838
                                            wdunwoody@munckwilson.com
                                            Chase A. Cobern
                                            Texas Bar No. 24101633
                                            ccobern@munckwilson.com
                                            MUNCK WILSON MANDALA LLP
                                            12770 Coit Road, Suite 600
                                            Dallas, Texas 75251
                                            (972) 628-3600
                                            (972) 628-3616 fax

                                            *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this document has been served via the Court's CM/ECF to counsel of record in accordance with the Federal Rules of Civil Procedure on December 6, 2021.

                                            /s/ Chase A. Cobern
                                            Chase A. Cobern


## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

                                            /s/ Chase A. Cobern
                                            Chase A. Cobern