**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**


| | | |
|---|---|---|
| BOXCAST INC. | ) | CASE NO. 2:21-cv-00217 |
| | ) | |
| Plaintiff, | ) | JUDGE RODNEY GILSTRAP |
| | ) | |
| vs. | ) | JURY TRIAL REQUESTED |
| | ) | |
| RESI MEDIA LLC, PUSHPAY, INC., AND | ) | **PUBLIC REDACTED VERSION** |
| PUSHPAY HOLDINGS LTD. | ) | |
| | ) | |
| Defendant. | ) | |


<u>**REPLY BRIEF IN SUPPORT OF BOXCAST'S
MOTION FOR PRELIMINARY INJUNCTION**</u>

**<u>Table of Contents</u>**

A.  BoxCast has shown a clear likelihood that Resi infringes the '574 Patent...................... 1

1.  Resi argues sufficiency of evidence but does not dispute the facts. ............................ 1

2.  Resi directly infringes all asserted claims of the '574 Patent. ........................................ 2

3.  Resi's modified design is an insubstantial change that still infringes. ........................... 4

B.  Resi has not raised a substantial question of validity. .................................................... 6

1.  BoxCast's proposal to Jenkins in 2008 was not a sale of the invention. ....................... 6

2.  The '574 Patent is directed to patent-eligible subject matter......................................... 8

3.  Resi's cobbled-together obviousness arguments fail to raise questions of validity. ...... 9

C.  Resi's continued infringement will cause BoxCast irreparable harm........................... 11

1.  There is a strong causal nexus between Resi sales and automated scheduling. ........... 11

2.  Resi and BoxCast are the two main players in the relevant market. ............................ 13

3.  Resi's infringement is causing and will continue to cause irreparable harm............... 14

4.  The equities favor an injunction. .................................................................................. 15

D.  CONCLUSION............................................................................................................ 15

## Table of Authorities

Cases

*Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc) ........................................................................................................................................ 3
*Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633 (Fed. Cir. 2015) ................................. 13, 15
*Aug. Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278 (Fed. Cir. 2011) ............................................. 7
*Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356 (Fed. Cir. 2018) ......................... 2
*E-Link Tech. Co., Ltd. v. Shenzhen Uni-Sun Electronics Co., Ltd.*, 2020 WL 8079816 (N.D. Ill. May 14, 2020) ........................................................................................................................ 14
*Genband US LLC v. Metaswitch Networks Corp.*, 2018 WL 11357619 (E.D. Tex. Mar. 22, 2018) ................................................................................................................................... 11, 12
*Golden Hour Data Systems, Inc. v. emsCharts, Inc.*, 2:06-CV-381, 2014 WL 8708239 (E.D. Tex. Mar. 31, 2014) ...................................................................................................................... 13
*Graham v. John Deere Co.*, 383 U.S. 1 (1966) .......................................................................... 10
*Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605 (1950) ................................... 6
*Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986) ..................................... 1
*Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018) ................................................... 3
*Pfaff v. Wells Elec., Inc.*, 525 U.S. 55 (1998) ............................................................................. 7
*Rare Breed Triggers, LLC v. Big Daddy Enterprises, Inc.*, No. 1:21cv149, 2021 WL 6197091 (N.D. Fla., Dec. 30, 2021) ...................................................................................................... 14
*RMH Tech LLC v. PMC Industries, Inc.*, 352 F. Supp. 3d 164 (D. Conn. 2018) ......................... 11
*Sparton Corp. v. United States*, 399 F.3d 1321 (Fed. Cir. 2005) ................................................. 7
*TEK Global, S.R.L. v. Sealant Systems International, Inc.*, 920 F.3d 777 (Fed. Cir. 2019) ......... 11
*Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370 (Fed. Cir. 2017) ...................................................... 2

**A.      BoxCast has shown a clear likelihood that Resi infringes the '574 Patent.**

Resi has all-but admitted infringement by modifying its products, after the start of this litigation, solely to try and avoid infringement. Resi does not even refute that its pre-modification products lack a single limitation of the Asserted Claims—instead alleging only that BoxCast relies on "attorney argument." Resp. 4–5. For these reasons and those further set forth below, Resi fails to rebut the clear likelihood of infringement set forth in BoxCast's Motion.

        *1.      Resi argues sufficiency of evidence but does not dispute the facts.*

Resi contends that BoxCast cannot show infringement without expert testimony, yet never refutes BoxCast's allegations or explains why expert testimony would be needed. Nor does the law support that expert testimony is required: "We have never *required* a party to proffer expert testimony on claim interpretation or on application of claim language to accused devices." *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266 (Fed. Cir. 1986), *overruled on other grounds, Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc).

Far from relying on just "attorney argument," Opp. at 4–5, BoxCast's contentions include links and references to numerous public documents, technical documents and videos filed in this litigation that lay out a clear case for infringement. ECF No. 42-58 (Ex. C-49); Ex. D-6. Critically, Resi's Opposition briefing does not attempt to rebut even one of these contentions for their pre-modified system[1]—not even for a single limitation. Because Resi is not challenging anything in BoxCast's contentions, it is unclear why expert testimony is necessary.

Resi is incorrect that it "submitted uncontroverted expert testimony" on infringement. Resp. at 5. Other than his opinion on the modified design, introduced after the filing of this case,

---

[1] Despite having rolled out the modified design in August, 2020, ECF No. 59-14 (Ex. C) ¶ 6, Resi withheld all mention of it (including in discovery and contentions) until it filed its Response to this Motion. Resi failed to even mention it during the pre-motion meet and confer required by Local Rule CV-7(h).

Resi's expert offers only two ***fully-legal*** non-infringement positions that are not mentioned in Resi's brief. First, ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ ECF No. 59-17 (Ex. E) ¶ 109. Not only does this argument remove "data relating to" from the claim, it is the same claim construction argument the defendant made in the prior *YSL* case. The Court in *YSL* unequivocally rejected it, after a thorough review of prosecution history, finding that "BoxCast did not disclaim schedule data in a format that acts as a command or instruction." ECF No. 1-8 (Ex. G), at 59.

Second Dr. Easttom notes ████████████████████████████████████████

████████████████████████████████████ ECF No. 59-17 (Ex. E) ¶ 114. If anything, this demonstrates that Resi's default mode infringes. *See* Ex. D-1 ¶ 63. And, as a matter of law, "infringement is not avoided merely because a non-infringing mode of operation is possible." *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1363 (Fed. Cir. 2018) (quoting *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007)).

  2. *Resi directly infringes all asserted claims of the '574 Patent.*

  Resi's argument that BoxCast has not shown ***direct*** infringement fails because (1) Resi does not address divided infringement that Resi directs and controls, (2) Resi directly infringes other claims of the '574 Patent on its own, and (3) Resi is still an indirect infringer. BoxCast squarely addressed these issues in its recently-filed Second Amended Complaint. ECF No. 67.

  First, Resi ignores that direct infringement still occurs where "an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance*." Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1378 (Fed. Cir. 2017). The "common thread" in so-called "divided

infringement" cases is "evidence that a third party hoping to obtain access to certain benefits can only do so if it performs certain steps identified by the defendant, and does so under the terms prescribed by the defendant." *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1352 (Fed. Cir. 2018) (quoting *Travel Sentry*, 877 F.3d at 1380).

In *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, the Federal Circuit found that, despite defendant's customers performing the claimed "tagging" and "serving" steps of a method for delivering content over the internet, the defendant "direct[ed] and control[led] its customers' performance of each remaining step, such that all steps of the method [were] attributable to [defendant]." 797 F.3d 1020, 1024 (Fed. Cir. 2015) (en banc). Specifically, the defendant conditioned its customers' use of the content delivery network upon performance of the tagging and serving steps, and thus established the manner of the customers' performance. *Id.*

As in *Akamai*, Resi provides encoders to customers with instructions for situating them behind a router and setting recording start times for live events. ECF Nos. 1-10 to 1-16; ECF No. 67 ¶¶ 62–78. Resi maintains access to encoders to ensure users follow Resi's instructions. *Id.* If a user does not perform the requisite steps, Resi's services will not be available. *Id.* Due to Resi's direction and control, user action is attributable to Resi, who is liable for direct infringement.

Second, Resi addresses only claim 1 of the '574 Patent and ignores other independent claims 12 and 22. Unlike claim 1, claims 12 and 22 do not require steps performed by a user. Claim 12 is a system claim similar to claim 1. Claim 22 is a method claim like claim 1 but performed from the perspective of Resi controlled server(s). Resi's system meets each claim limitation of claim 12 and the services Resi provides meet each claim limitation of claim 22. Ex. D-6. Resi thus also directly infringes at least claims 12 and 22 of the '574 Patent.

Finally, even if users of Resi encoders are deemed direct infringers of claims 1 and 6,

3

Resi is clearly an indirect infringer through its advertising, marketing, sale, offer for sale and instruction for use of Resi encoders. ECF Nos. 1-10 to 1-16; ECF No. 67 ¶¶ 62–78. Resi knew of the '574 Patent, knew its actions would induce direct infringement by users of Resi encoders, and intended to induce direct infringement.[2] ECF No. 59-5 (Ex. A-4). Therefore, even if users are direct infringers of claims 1 and 6, Resi is still an indirect infringer.

> 3.      *Resi's modified design is an insubstantial change that still infringes.*

Resi's slapdash design-around attempt is nothing but semantics—Resi's encoders still send a "request"[3] and still receive "data relating to a recoding start time" in response. Resi's only real motivation for the change was to avoid infringement, and the change still infringes.

Resi argues that its modified design does not "request" encoding instructions, it

██████████████████████████████████████████████████████████████████

ECF No. 59-17 (Ex. E) ¶¶ 100–01. These are meaningless semantic distinctions that still infringe the '574 Patent and do not hold up on review of how Resi's modified system actually works.

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[2] Additionally, Resi indirectly infringes the '574 Patent by contributory infringement by providing non-staple components in order to perform the claimed method as the Resi encoders do not function unless the claimed steps are performed. *Id.* at ¶¶ 62–83.

[3] It is even a request "for data relating to a recording start time," to the extent that is required by the claim.

5 191:15–192:10. Both these positions are meritless. First, Resi's CTO Brad Reitmeyer testified

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

    Upon investigation, Resi's alleged justifications for making the modification completely

fell apart. ██████████████████████████████████████████████████████

███████████████████████████████ECF No. 59-1 (Ex. A) ¶ 19.█████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████This was not

"Resi" developing the idea for the modification in advance of this litigation.

███████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████ It is thus clear

the only reason for Resi's "modification" was to try to avoid infringement—and Resi failed.

Finally, even taking Resi's arguments at face value and assuming Resi's redesign does

not literally infringe (which it does), this is a textbook application of the doctrine of equivalents.

An equivalent limitation infringes if it is insubstantially different than what is claimed in the eyes

of a POSITA. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 619 (1950).

Resi's modification—a hasty attempt at semantics to try to avoid infringement—provides no real

benefit over the claims of the '574 Patent. Ex. D-1 ¶¶ 65–67. It hardly changes the working of

Resi's original literally-infringing system at all. Even if the modified design does not literally

infringe the request step, it does so under the doctrine of equivalents.

**B.     Resi has not raised a substantial question of validity.**

Resi argues the '574 Patent is invalid based on (1) an alleged on-sale bar ████████████

██████████████████████████████████ (2) patent

eligibility, despite clear evidence that the claimed *system* is not directed to an abstract idea, and

(3) obviousness based on a patchwork of disparate references and despite significant evidence

that Resi's proposed combinations would not have, and in fact did not, work. None of Resi's

arguments create a substantial question of validity.

*1.*     ████████████████████████████

████████████████████████████████████

█████████████████████████████████████ and

6

thus cannot be a bar to patenting. BoxCast could not have sold what it had not yet conceived. *Aug. Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1289 (Fed. Cir. 2011).  An on-sale bar requires both (1) a commercial offer for sale of the invention, and (2) that the invention be ready for patenting. *Pfaff v. Wells Elec., Inc.*, 525 U.S. 55, 67–68 (1998). Resi has not presented any actual evidence for either prong.

First, Resi has not shown that the ████████ included all the claimed elements. Critically, ██████████████████████████████████████████ ████████████████████████████████ *See Sparton Corp. v. United States*, 399 F.3d 1321, 1324 (Fed. Cir. 2005) (citing *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1358–59 (Fed. Cir. 1999)) (no bar where an offer for sale failed to demonstrate all the claim limitations). Instead, Resi points only to what BoxCast eventually produced a year ***after*** the purported sale. There is no evidence BoxCast intended to create an automated scheduling or router-related feature at the time of the ████████ *See* Ex. E-1 ¶¶ 101–02.

Second, Resi has pointed to no actual evidence that the invention was ready for patenting at the time the proposal. The Supreme Court is clear that proof of ready for patenting requires (1) proof of reduction to practice or (2) proof that the inventors had prepared drawings or other descriptions of the invention "that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 68. Here, the earliest possible reduction to practice date (i.e., a prototype that worked for its intended purpose) would not have been until after March 13, 2009. Ex. E-11. Resi has not provided ***any*** evidence showing the invention was ready for patenting prior to the ████████—because none exists. Resi offers only speculative expert testimony that BoxCast must have had the invention in mind before the ████████ based on what he believed it must have taken to implement it. ECF No. 59-17 (Ex. E) ¶ 122. This

7

speculation is faulty. Ex. E-1 ¶ 102. It also clearly does not meet the *Pfaff* standard, and thus does not demonstrate that the '574 Patent is invalid due to the ███████████████████████.

> 2.    *The '574 Patent is directed to patent-eligible subject matter.*

The '574 Patent certainly passes muster under 35 U.S.C. § 101 and Resi fails to raise any substantial questions on this point.  BoxCast's arguments on the patent are set forth in its responses to Resi's motions to dismiss, ECF Nos. 17, 26, 45, 52. In sum, the claims are directed to a combination of a unique distributed architecture (including a specialized ABD) and a specific sequence of transmissions between them to allow automated scheduling of live broadcasting without modification of a router. Amazingly, after Resi filed two motions to dismiss this case on the pleadings, arguing that no fact disputes need be resolved to determine subject matter eligibility, Resi now tells that Court that BoxCast cannot show eligibility without expert testimony and other evidence. Resp. 10. Yet BoxCast **has** provided evidence that the claimed ABD is a specialized (non-generic) device that precludes the claim being directed to an abstract idea—this despite the fact that BoxCast had no burden to produce any affirmative validity evidence in filing this Motion. Mot. 29–30. Resi is wrong to discount BoxCast's evidence, Resp. 10–11, because "ABD" is not some throwaway term, but is instead described specifically as a specialized device in the '574 Patent's specification. '574 Patent 8:48–9:57.

Moreover, BoxCast's expert, in rebuttal to Resi's invalidity positions, provided significant evidence that at the time of the '574 Patent, other service providers were unable to offer remote broadcasting or automated scheduling features that were manageable for non-tech-savvy users. Ex. D-1 ¶¶ 57, 96. In fact, Resi's expert and CTO both admitted that the "SIP" protocol Resi relies on for invalidity was overly complex and would not have worked without modifying the router, which the claims forbid. Ex. E-5 135:3–7; Ex. E-6 45:4–25. Finally, the fact that the owner of the cited Allen reference (see below) came to BoxCast to demo BoxCast's

patented ABD should dispel any notion that it is just a generic device used in a fundamental way.

3.     *Resi's cobbled-together obviousness arguments fail to raise questions of validity.*

While Resi tells that Court that the '574 Patent is directed to fundamental and generic technologies, Resi had to resort to breaking the claims into tiny pieces and cobbling together highly disparate references in an attempt to show all the claim limitations for obviousness. Resi relies on: a university lecture capture system (Allen) and a poorly-translated Korean reference (Kim) to show using a schedule to record live events; a voice recognition protocol (Maes) to show routers and generic requests; and a DVR recorder (Horowitz) to show transmission of data relating to start and stop times. These prior art combinations do not render the Asserted Claims obvious because they fail to teach all the claimed limitations and there is no evidence that their combination would have achieved the claims of the '574 Patent. Ex E-1 ¶¶ 76–100. Just the opposite—not only does the record show that prior attempts to combine the references as Resi alleges failed, but that the owner of the Allen reference **approached BoxCast years after the '574 Patent was filed seeking to use BoxCast's patented hardware and systems**. Ex. E-12. Clearly, the claims of '574 Patent are not so obvious as Resi paints them to be.

First, the asserted Allen reference discloses a university lecture capture system on a closed network for time-shifted (not live) viewing and thus does not expressly disclose routers or initiating communications from the capture devices. Ex. E-1 ¶¶ 59, 64. Resi's expert just simply assumes the routers are there—pulling them from thin air. Ex. E-5 125:19–126:6. Likewise, the Kim reference discloses capturing video based on a schedule and sending it to a central repository, but shows no routers and does not show communication being initiated from the video capture devices.  Ex. E-1 ¶¶ 86–87. The cited Horowitz reference also fails to disclose routers, and the user in Horowitz is at the location of the recording device (a DVR), which is contrary to the '574 Patent claims.  *Id.* A POSITA would understand that neither Allen, Kim, nor

Horowitz would function if routers were placed in between the components. *Id.* ¶¶ 84–85, 88, 90.

Resi attempts, and fails, to resolve this deficiency with the Maes reference, which Resi alleges teaches a "request-response protocol" that goes through a router. Resp. 13. The "gateways" of Maes, however, are not routers at all, but specialized protocols that are not at the location of the client devices and do not block traffic to the client devices as claimed. Ex. E-1 ¶¶ 67–69, 92. Both Resi's expert and CTO admitted that the "SIP" (request-response) protocol of Maes was overly complex and would not work with routers unless the routers were modified, which is expressly forbidden by the claims. Ex. E-5 135:3–7; Ex. E-6 45:4–25. Thus, combining Maes with Allen, Kim and/or Horowitz does not teach all limitations of the claims of '574 Patent and does not render them obvious.[4]

Finally, simply comparing the patent and the prior art is not the end of the analysis—the Court must also consider other evidence of non-obviousness, including a long-felt need for the invention and the failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Here there is strong evidence of both to support non-obviousness. First, for years prior to the '574 Patent, streaming devices such as SlingBox used the prior-art methods described in the '574 Patent, namely port forwarding, to get around routers and firewalls, despite consumers complaining heavily about the difficulty in setting up these devices. Ex. E-1 ¶¶ 57, 96. It was not until years after the '574 Patent that SlingBox solved the issue. Second, attempts to scale the Allen reference to the cloud were fraught with technical problems, and it only worked for audio recordings (not live video). *Id.* ¶¶ 97–100.[5] That is likely why, in 2014, the owners of Allen approached BoxCast about a partnership to use BoxCast hardware and services covered by the

---

[4] BoxCast's expert provided additional reasons why a POSITA would not be motivated to combine the references. Ex. E-1 ¶¶ 93–95.
[5] Resi's expert took the legally erroneous position that the failure of others is irrelevant, which calls into question the veracity of his obviousness opinion. Ex. E-5 131:3–25.

'574 Patent. Ex. E-12. Given the totality of the evidence—the deficiencies of the references and the evidence of non-obviousness, Resi has not shown a substantial question of invalidity.

**C.      Resi's continued infringement will cause BoxCast irreparable harm.[6]**

   *1.      There is a strong causal nexus between Resi sales and automated scheduling.*

Resi's claim that "There Is No Competent Evidence of Causal Nexus" is simply untrue.[7] There is ample evidence to establish that automated scheduling is—at minimum—"one of several features that cause consumers to make their purchasing decision."[8] Opp. at 17 (*quoting Genband US LLC v. Metaswitch Networks Corp.*, 2018 WL 11357619, at *2 (E.D. Tex. Mar. 22, 2018)). Ex. F ¶¶ 14–25; *see also, e.g.*, ECF 42 at 12–14; *see also infra*. According to Resi's own CEO, Resi designed its automated scheduling feature with churches in mind, as it is "an intuitive and convenient way to make their lives easier." Ex. G, 172:3–11. This is because churches have reoccurring services (*see* Ex. H, 68:18–69:7) and rely on volunteers rather than IT staff (*see id.*, 68:1–9; Ex. I). Thus, automation is particularly valuable to churches, which make up ████ ████████ Ex. J. Resi acknowledges this value on its website,[9] marketing materials (Ex. K), and pitches to potential investors (Ex. L). Resi's expert admitted that automated scheduling "***is a factor for consumers in making a [purchasing] decision.***" Ex. H, 70:5–15 (emphasis added). This alone is often dispositive. *See Genband*, 2018 WL 11357619, at *2 ("[E]vidence that a patented feature is ***one of several features that cause consumers to make their purchasing decisions*** may suggest that a patented feature is a driver of consumer demand.") (emphasis added) (internal quotations omitted).

---

[6] Resi's "design changes" still infringe the '574 patent so they don't moot BoxCast's Motion. *See supra* 4–6,
[7] *Genband* (citation below) does not hold that BoxCast *must* submit survey evidence to establish a causal nexus. The court said it is an "example" of evidence that could show a causal nexus. *Id.* Causal nexus can be demonstrated in a "variety of ways." *RMH Tech LLC v. PMC Industries, Inc.*, 352 F. Supp. 3d 164, 201 (D. Conn. 2018).
[8] *See also, TEK Global, S.R.L. v. Sealant Systems International, Inc.*, 920 F.3d 777, 792 (Fed. Cir. 2019).
[9] https://resi.io/solutions/churches/ (last accessed on January 17, 2022).

Moreover, Resi's *own customers* praise automated scheduling in the very same reviews Resi cites in its Opposition Brief. *See* Opp. 20, Ex. A-6.

- "No more alarms to remember when pushing live events. We can schedule events minutes or years before going live--truly a set it and forget it!" – Joel D

- "Resi has made training our volunteers easier. They no longer have to start the stream at a certain time, and that guarantees we are always streaming when we need to be." – Dylan J

- "It's so simple to just schedule the services and the encoder automatically runs without any additional programming. It's sure made my life easier and has given me the ability to go home sooner on Saturday nights after service, so I can rest up for Sunday services." – Ian R

Ex. M; *see also* Ex. F, ¶¶ 22 –25. Resi's customers consistently identify automated scheduling as a valuable feature (*see* Ex. M for many other examples), thus contradicting Resi's claim that they do not value it—they are, in fact, attracted to it.[10] Opp. 18. Resi's CEO admitted feedback from customers indicates what they consider important to their purchasing decisions. Ex. G, 153:8–23. This is the type of evidence the *Genband* court held is the focus of the causal nexus inquiry. *Genband*, 2018 WL 11357619, at *3.

Resi's arguments that the Pushpay acquisition and market saturation are "alternative reasons" for BoxCast's harm are both untrue. Opp. 21–23. Instead, it can be—and is—both true that (1) Resi's automated scheduling feature drives purchasing decisions *and* that (2) the Pushpay acquisition will exacerbate the harm caused by Resi's infringement. Ex. F, ¶ 63; *see also* Ex. H, 183:9–186:14. The harm is not *either* caused by Resi's infringement *or* by the Pushpay acquisition, as Resi suggests. *Id.* Likewise, saturation of the church streaming market is an aggravating factor that makes the irreparable harm Resi is causing BoxCast more imminent and harmful—it is not an "alternative reason" for BoxCast's harm. Ex. F, ¶ 63.

The record evidence sufficiently demonstrates a causal nexus (in other words, "some

---

[10] Resi's expert admitted that, since Resi and BoxCast both offer automated scheduling, it would be unusual for a customer to specifically identify it as a reason for leaving BoxCast for Resi. Ex. H, 165:21–166:21. Neither Resi nor Dr. Tyler can know if Resi did not include the feature that a customer would have switched. *See* Ex. H, 167:8–23.

connection") between automated scheduling and demand for the Accused Products. *See Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 640 (Fed. Cir. 2015); *see also Golden Hour Data Systems, Inc. v. emsCharts, Inc.*, 2:06-CV-381, 2014 WL 8708239, at *9 (E.D. Tex. Mar. 31, 2014) (Gilstrap, J.) ("'Some causal nexus' does not equate to absolute causation. 'Some causal nexus' is established when a customer left [the patentee] and switched to [the infringer], at least in part, because [the infringer] was offering a comparable [infringing] system[.]").

> 2. *Resi and BoxCast are the two main players in the relevant market.*

Resi's attack on BoxCast's characterization of the relevant market ignores reality. Ex. F., ¶¶ 26–56. Resi and BoxCast are undeniably direct competitors in the livestreaming church market and the two primary companies in that market that offer automated scheduling—a particularly valuable feature for churches. Resi does not dispute that there is—at minimum—a church submarket within the broader live-streaming market, in which BoxCast and Resi compete. Ex. G, 76:19–23. And churches (especially small-to-mid-size churches) have a need for automated scheduling as they have a regular streaming schedule and typically lack IT support. Ex. H, 60:24–70:15; *see also* Ex. G, 93:14–23, 170:13–171:15, 175:13–21.

Resi contends that there are "at least 20 [companies] with automated scheduling capabilities," but this lacks any support. Figures 3.6–3.7 in Dr. Tyler's declaration list streaming companies with "scheduling *capabilities*," but Dr. Tyler acknowledged most of these "capabilities" are not automated scheduling. Ex. H, 135:3–149:11. For example, many provide for scheduling of *pre-recorded, uploaded* videos—not live-stream scheduling. *Id.*; *see also* Figs. 3.6, 3.7 to Tyler Decl. And Dr. Tyler admitted during his deposition that he mistakenly categorized several companies as having automated scheduling. Ex. H, 147:18–149:7. At bottom, Resi has not identified any other entities besides those BoxCast identified that offer automated scheduling—a feature that differentiates streaming products within the church market.

Resi's argument that the market must include every single company that offers live-streaming products ignores reality. Opp. 15–17. Resi's CEO even admitted that many of the companies he identified in his declaration (¶ 4) are not competitors. Ex. G, 37:1–40:11, 47:2–49:1. And almost all the companies Mr. Martel identified did not attend the largest church expo in the country, although both BoxCast and Resi did.[11] As Dr. Tyler acknowledged, submarkets often exist within broader markets, including where certain subsets of customers have specific needs. Ex. H, 42:14–43:7, 47:15–48:5; *see also* Ex. F, ¶¶ 27–33. Courts also acknowledge niche markets in the irreparable harm context. For example, in *Rare Breed Triggers, LLC v. Big Daddy Enterprises, Inc.*, a court recognized a two-player niche market within the rapid-fire gun market:

> To be sure, there are other products designed to increase the firing rate for AR-15 rifles and other firearms. . . . But the [embodying] and [accused products] are high-end devices marketed to firearm enthusiasts. . . . These are the two competitors within this niche, even though there are other products that might well be part of the broader, rapid-fire market.

No. 1:21cv149, 2021 WL 6197091, at *4 (N.D. Fla., Dec. 30, 2021). This reasoning applies in the church automated streaming market. Automated scheduling gives churches a benefit that sets these products apart in the church streaming market. BoxCast and Resi are the two real players in that market, intensifying the irreparable harm. Ex. F, ¶¶ 33.

      *3.     Resi's infringement is causing and will continue to cause irreparable harm.*

Either way—however many players are in the market[12]—discovery has confirmed that Resi has ███████████████████████████████████ Ex. F, ¶ 38. Absent an injunction, ████████████████████████████████████████████████████████████████████

---

[11] *See* https://web.archive.org/web/20180708162016/http://conference.wfxevents.com/wfx18/public/Exhibitors.aspx?ID=1069768&sortMenu=106000; https://wsdg.com/wfx-conference-expo-2019/ (accessed on January 18, 2022).

[12] Additional competitors does not cut against an irreparable harm finding. *E-Link Tech. Co., Ltd. v. Shenzhen Uni-Sun Electronics Co., Ltd.*, 2020 WL 8079816, at *2 (N.D. Ill. May 14, 2020).

ECF 42 at 8–16; Ex. F, ¶¶ 57–63. Resi does not deny the high customer retention in the church streaming market. This makes Boxcast's customer loss to Resi irreversible, and continued customer and market share loss to Resi will require ███████████████████████████ ████████████████████ ECF 42 at 16. This harm is irreparable. [13] *Id.* at 15–16; Ex. F, ¶¶ 71–72. Moreover, without an injunction, ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████Ex. G, 158:11–23, 161:15–162:4. This simply affirms BoxCast's need for an injunction.

    4.    *The equities favor an injunction.*

    Resi's alleged harm should the Court enjoin it during this lawsuit does not outweigh the irreparable harm Resi is causing BoxCast with its infringement. Ex. F, ¶¶ 73–78. ████████████ ████████████████████████████████████ but this claim just demonstrates the strong causal nexus between the automated scheduling functionality and Resi's sales. The fact that Resi would subject itself to an injunction that could cost it ██████ rather than turn the infringing feature off is telling. [14] Ex. N, 106:15–25. Further, "the public generally does not benefit when [] competition comes at the expense of a patentee's investment-backed property right." *Apple*, 809 F.3d at 647.

**D.    CONCLUSION**

    For the reasons set forth above and in Boxcast's Motion, this Court should grant a preliminary injunction as requested by Boxcast.

---

[13] BoxCast did not unreasonably delay in moving for an injunction. Resi cites no case that finds waiting less than a year to move for an injunction a "substantial delay." Further, the Pushpay acquisition did not occur until late August 2021, and BoxCast filed its preliminary injunction motion promptly thereafter.
[14] ████████████████████████████████████████████████ ████████████████████████████████

Dated: January 19, 2022                          Respectfully submitted,

                                                 /s/ *Jennifer Truelove*
                                                 Mark W. McDougall (Ohio# 0080698)
                                                 (admitted *Pro Hac Vice*)
                                                 mmcdougall@calfee.com
                                                 John S. Cipolla (Ohio# 0043614)
                                                 (admitted *Pro Hac Vice*)
                                                 jcipolla@calfee.com
                                                 Todd R. Tucker (Ohio# 0065617)
                                                 (Pro Hac Vice forthcoming)
                                                 ttucker@calfee.com
                                                 Joshua A. Friedman (Ohio# 0091049)
                                                 (admitted *Pro Hac Vice*)
                                                 jfriedman@calfee.com
                                                 Andrew W. Alexander (Ohio#0091167)
                                                 (admitted *Pro Hac Vice*)
                                                 aalexander@calfee.com
                                                 **CALFEE, HALTER & GRISWOLD LLP**
                                                 The Calfee Building
                                                 1405 E. 6th Street
                                                 Cleveland, Ohio 44114
                                                 Telephone: (216) 622-8200
                                                 Facsimile: (216) 241-0816

                                                 Samuel F. Baxter (Texas Bar No. 01938000)
                                                 sbaxter@mckoolsmith.com
                                                 Jennifer L. Truelove (Texas Bar No.
                                                 24012906)
                                                 jtruelove@mckoolsmith.com
                                                 **MCKOOL SMITH, P.C.**
                                                 104 E. Houston Street, Suite 300
                                                 Marshall, Texas 75670
                                                 Telephone: (903) 923-9000
                                                 Facsimile: (903) 923-9099

                                                 *Attorneys for Plaintiff BoxCast Inc*

16

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

The undersigned certifies that the foregoing document is authorized to be filed under seal

pursuant to the Protective Order entered in this case.

/s/ *Jennifer Truelove*

**CERTIFICATE OF SERVICE**

I certify that counsel of record who are deemed to have consented to electronic service are being served on January 21, 2022, with a copy of this document via the Court's CM/ECF systems per Local Rule CV-5(a)(3). Any other counsel will be served by electronic mail, facsimile, overnight delivery and/or First Class Mail on this date.

    /s/ *Jennifer Truelove*