IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| BOXCAST INC., § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | CIVIL ACTION NO. 2:21-CV-00217-JRG |
| § | |
| RESI MEDIA LLC, PUSHPAY § | |
| HOLDINGS LTD., PUSHPAY USA, INC § | |
| § | |
| *Defendants*. § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff BoxCast Inc.'s ("BoxCast") Motion for a Preliminary Injunction (the "Motion"). (Dkt. No. 42). Having considered the Motion, the briefing and the supporting declarations and argument, and for the reasons set forth herein, the Court finds that the Motion should be **DENIED**.[1]

**I.  BACKGROUND**

On June 16, 2021, BoxCast filed this case against Resi alleging infringement of U.S. Patent No. 9,686,574 (the "'574 Patent") and U.S. Patent No. 10,154,317 (the "'317 Patent") (collectively, the "Asserted Patents").[2] (Dkt. No. 1). On August 22, 2021, Pushpay[3] and Resi published a joint video announcing that Pushpay had acquired Resi (the "Pushpay Acquisition"). (Dkt. No. 42 at 11). On October 6, 2021, BoxCast filed an amended complaint adding claims of indirect infringement of the Asserted Patents against Pushpay, Inc. and Pushpay Holdings Ltd.

---

[1] Also before the Court is Resi Media LLC's ("Resi") Motion to Strike Declarations of Peter Spaudling [sic] and Michal Malkiewicz (the "Motion to Strike"). (Dkt. No. 58). During the March 18, 2022 hearing, the Court first heard arguments on the Motion to Strike, and the Motion to Strike was **DENIED**. (Dkt. No. 142 at 12:10–21).
[2] BoxCast's Motion, however, is only based on the '574 Patent.
[3] There are multiple Pushpay entities involved in this litigation, but the distinction between them is irrelevant for the purposes of resolving the Motion.

(Dkt. No. 28). On November 1, 2021, BoxCast filed the instant Motion for a Preliminary Injunction seeking only to enjoin Resi from selling to new customers after August 22, 2021—the date the Pushpay Acquisition was announced. (Dkt. No. 42). On January 3, 2022, BoxCast filed a second amended complaint, seemingly substituting Pushpay USA Inc. for Pushpay Inc. (Dkt. No. 67). Despite the November 1, 2021 filing date of the Motion, the Motion was not completely briefed until February 23, 2022. (Dkt. No. 110). The parties asked for, and the Court granted, four separate extensions on briefing BoxCast's Motion. (Dkt. Nos. 48, 51, 63, 64, 84, 88, 97, 99). On March 18, 2022, the Court held a hearing on BoxCast's Motion—offering the parties an opportunity to present evidence and argument on the Motion. (Dkt. No. 139; Dkt. No. 104). The parties offered oral argument at the March 18, 2022 hearing but did not present live testimony. (*See* Dkt. No. 137; *see generally* Dkt. Nos. 141, 142).

**II.   LEGAL STANDARD**

To obtain a preliminary injunction, a movant must show that: (1) it is likely to succeed on the merits, (2) it will suffer irreparable harm without injunctive relief, (3) the balance of hardships tips in its favor, and (4) an injunction is in the public's interest. *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1323 (Fed. Cir. 2012); *Trebro Mfg. v. FireFly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This "extraordinary remedy . . . may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* "[W]hat is at issue here is not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "The grant or denial of a preliminary injunction pursuant to 35 U.S.C. § 283 is within the discretion of the district court." *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1558 (Fed. Cir. 1996).

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959). Courts therefore look "to evidence of what actual damage was likely due to any continuation of [Defendant's] alleged infringing sales and whether money damages will provide adequate compensation and vindication of [Plaintiff's] patent rights." *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994). "[T]he district court may deny a preliminary injunction based on the movant's failure to establish either of [likelihood of success on the merits or irreparable harm] without making additional findings respecting the other factors." *Id.* at 1556. "To show irreparable harm, it is necessary to show that the infringement caused harm in the first place. Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature." *Apple*, 678 F.3d at 1324.

### III.   DISCUSSION

As the Court noted above, in order for the Court to preliminarily enjoin Resi's allegedly infringing conduct, BoxCast must show that it will suffer irreparable harm absent an injunction. For the reasons set forth below, the Court finds that BoxCast has failed to make this necessary showing, and such is fatal to its Motion.

#### A.   Lack of Irreparable Harm

BoxCast argues that it "will continue to *irreversibly* lose valuable customers and market share at an accelerated rate, and BoxCast's goodwill and reputation as an innovator and market leader will continue to be diminished" absent injunctive relief. (Dkt. No. 42 at 8). BoxCast notes that the Federal Circuit has recognized that harm in patent infringement is almost always irreparable because "protecting a right to *exclude* through monetary remedies that allow an infringer to *use* an invention against the patentee's wishes" is a difficult task. (*Id.* at 8) (quoting *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 638–39 (Fed. Cir. 2015)). BoxCast argues that

"[c]ourts routinely consider harms like those in this case 'irreparable' . . . [including] lost customers and lost market share." (*Id.*). BoxCast also notes loss of goodwill and reputation are harms that are manifestly irreparable along with the harm that results from having to reduce workforce. (*Id.* at 9).

BoxCast argues that it directly competes with Resi in the automated streaming church market and that the irreparable harm is amplified because of this direct competition in the marketplace. (*Id.*). BoxCast argues that there are four primary market participants in the following order: (1) BoxCast, (2) Resi, (3) StreamSpot, and (4) Haivision. (*Id.*). BoxCast argues that it and Resi make up 80% of the market. (*Id.* at 9–10) (citing Dkt. No. 42-1 ¶¶ 52–54; Dkt. No. 42-2 ¶ 14). BoxCast also notes that Pushpay is a large player in the market, offering digital solutions for giving and donor management and event planning to over 11,000 churches. (*Id.* at 10). BoxCast notes that before the Pushpay Acquisition, Pushpay did not offer live streaming. (*Id.*). BoxCast argues that Resi and Pushpay will seek to leverage Pushpay's market position to bundle Resi's allegedly infringing product to increase their market share.[4] (*Id.*). BoxCast argues that there is a strong causal nexus between the patented features—noting that Resi promotes "automated scheduling"—and Resi's sales, market share, and growth at BoxCast's expense (i.e., the alleged harm). (*Id.* at 13).

BoxCast contends that these harms are irreparable. BoxCast argues that "[i]t will be very difficult for BoxCast to recoup customers lost to Resi because customers in this market stick with their live-streaming provider for several years." (*Id.* at 15) (citing Dkt. No. 42-2 ¶ 11). BoxCast notes that both business models offer live-streaming hardware and monthly streaming services—

---

[4] As support, BoxCast points to a joint video created by Resi and Pushpay as well as mass e-mails promoting the same. (Dkt. No. 42 at 11). BoxCast argues that after this promotion effort by Resi and Pushpay, a BoxCast customer inquired about the cancellation policies and switching to Resi. (*Id.* at 12; Dkt. No. 42-5).

resulting in long customer lifespans. (*Id.*). BoxCast points to *Trebro Mfg.* as support that in this "tight market," "every sale to [Resi] is essentially a lost sale to [BoxCast]." (Dkt. No. 42 at 16) (citing *Trebro Mfg.*, 748 F.3d at 1170). BoxCast argues that the irreparable harm is apparent here because "hundreds of BoxCast's own customers are being directly targeted by Resi and Pushpay's cross-selling campaign." (*Id.*). BoxCast also argues that it "experienced *negative* growth last month in September . . . [and] if this trend continues, BoxCast cannot continue to invest in personnel and will likely have to lay off current employees." (*Id.* at 17). BoxCast argues that the inability to invest in personnel and R&D will accelerate the irreparable damage to BoxCast's market share, goodwill, and reputation. (*Id.* at 17–18).

Resi responds that its design changes moot BoxCast's Motion and any alleged irreparable harm. (Dkt. No. 59 at 15). Resi also points out that BoxCast's entire Motion is predicated on a declaration by BoxCast's VP of Finance, Peter Spaulding—who, Resi argues, testified at deposition that he has no personal knowledge of key facts regarding the scope of the market.[5] (*Id.*). Resi argues that BoxCast's contention that this is a narrow market with two key players is inaccurate and made up for purposes of this lawsuit. (*Id.* at 16). Resi argues that the market consists of at least thirty-five livestreaming solutions, many of which are free. (*Id.* at 16) (citing Dkt. No. 59-16 ¶¶ 11(b), 56, 59–67, Fig. 3.2, 68–71, Figs. 3.6–3.7; Dkt. No. 59-37 at BOXCAST_001408, 11–18; Dkt. No. 59-1 ¶¶ 4–10; Dkt. No. 59-9 ¶¶ 3–4).

Resi also argues that "BoxCast further fails to prove any connection between the alleged harms and alleged infringement." (*Id.* at 17). Resi argues that such requires evidence that the patented feature causes consumers to make their purchasing decisions. (*Id.*). Resi also notes that BoxCast provides no survey evidence, which Resi argues is typically provided by a movant to

---

[5] As noted above, Resi moved to strike Mr. Spaulding's declaration, which the Court **DENIED**. (*See* n.1, *supra*).

5

show the nexus requirement. (*Id.*). Resi argues that the few isolated customer e-mails raised by BoxCast do not show a nexus between the patented features and Resi's customer procurement. (*Id.* at 18). Resi points out that its product is more expensive and "automated scheduling" is included in both Resi and BoxCast's base plans and therefore could not be a deciding factor. (*Id.* at 20) (citing Dkt. No. 59 at 2; Dkt. No. 59-1 ¶ 3; Dkt. No. 57-16 ¶¶ 11(c), 74–92). Resi argues that its products are known for superior streaming quality and reliability, and such is the cause for BoxCast's loss of customers. (*Id.*). Resi also notes that the harm caused by Resi's partnership (with Pushpay) is not caused by the alleged infringement. (*Id.* at 21). In other words, Resi argues that the harm caused by infringement would be all of Resi's conduct since 2016, but BoxCast is only seeking to enjoin new customers since August 22, 2021. (*Id.*). Resi notes that the scope of the injunction only addresses the harm allegedly caused by its partnership with Pushpay. (*Id.*). Resi points to Mr. Spaulding's testimony and argues that it shows it is the Pushpay/Resi bundling that is causing the alleged harm—which is not infringement. (*Id.* at 22). Resi also notes that the 2020 pandemic caused market saturation, which led to declines in growth, which BoxCast anticipated. (*Id.* at 23) (citing Dkt. No. 57-16 ¶ 11(g)).

Resi also argues that the harms BoxCast complains of are speculative. (*Id.* at 25). Resi notes that BoxCast even quantified the "value" in lost sales revenue associated with every customer supposedly lost to Resi—showing that damages are calculable. (*Id.*) (citing Dkt. No. 58-1 at 70:20–76:18). Resi also argues that BoxCast's willingness to license the asserted patents suggests damages could be calculated. (*Id.* at 26). Resi also points to BoxCast's delay in bringing an infringement suit and seeking injunctive relief as undermining irreparable harm. (*Id.* at 28). Resi contends that BoxCast knew of Resi's alleged infringement on or around December 2020,

yet did nothing. (*Id.*). Resi points out that BoxCast waited another four and a half months before moving for injunctive relief. (*Id.*).

The Court is not persuaded that BoxCast has met its burden to show irreparable harm. First, the Court finds that BoxCast has not adequately shown that the alleged harm is tied to the alleged acts of infringement. BoxCast points to the "automated scheduling" feature[6] allegedly found in Resi's product and notes that Resi's expert admitted that such is a factor for consumers in making a purchasing decision. (Dkt. No. 78 at 11). However, BoxCast ignores the evidence in the record that shows that Resi's product provides additional features and that Resi's product costs significantly more than BoxCast's product. (*E.g.*, Dkt. No. 57-9 ¶¶ 5–6; Dkt. No. 57-1 ¶¶ 21–25; Dkt. No. 57-7; Dkt. No. 57-8; Dkt. No. 57-16 ¶¶ 11(c), 74–92; *see also* Dkt. No. 57-37 at BOXCAST_001415 ("BoxCast offers a lower up-front cost entry point than Resi, as the free Broadcaster app, existing software or hardware encoders can be used to start streaming. Purchasing a BoxCaster for $399 is lower than the lowest cost encoder from Resi (RAY encoder is $1,299 and only has an SDI input).")). Specifically, Resi contends that its product features a unique "Resilient Streaming Protocol" or "RSP," which significantly improves the reliability of Resi's product over its competition. (Dkt. No. 59 at 2; Dkt. No. 59-1 ¶ 3; Dkt. No. 57-16 ¶¶ 11(c), 74–92). Further, there does not appear to be a dispute that both BoxCast and Resi offer "automated scheduling" in their base plan and that Resi's base plan is more expensive than BoxCast's base plan.[7] (Dkt. No. 57-16 ¶ 88; Dkt. No. 57-1 ¶¶ 21, 24; Dkt. No. 42 at 13; Dkt. No. 58-1 at 152:22–

---

[6] BoxCast makes general references to "automated scheduling" and assumes, without support, that every mention of it in Resi's marketing materials, customer reviews, or customer inquiries represents the claimed invention. The Court declines to do the same, but because BoxCast's allegations of irreparable harm fail for other reasons, as noted herein, the Court need not decide which references of "automated scheduling" refer to the claimed invention and which do not.

[7] It could be argued that the inclusion of the "automated scheduling" feature in every plan, including the base plan, indicates the feature is so essential to consumers that it is offered at every tier. However, this argument is at odds with BoxCast's argument that the feature is "valuable" to Resi. (Dkt. No. 142 at 18:3).

7

53:7). Additionally, the evidence before the Court shows that there are many providers that offer "automated scheduling" for free. (*Id.*). Considering the evidence before the Court, the Court is not persuaded that BoxCast has made a clear showing, as is required, that there is a nexus between the alleged harm and the alleged infringement.[8] As explained above, Resi's product has unique features and costs more than BoxCast's product. This evidence has gone substantially unrebutted.[9] The more likely explanation, based on the evidence, for BoxCast's alleged harm is that Resi makes a product with unique functionality—functionality that is not accused of infringement in this case—that consumers prefer. A finding of irreparable harm based on the evidence currently before the Court would essentially make every competitive act an act of irreparable harm. This would, in essence, resurrect the presumption of irreparable harm, which the Supreme Court has repeatedly admonished against. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393–94 (2006); *Winter*, 555 U.S. at 22; *Beacon Theatres*, 359 U.S. at 506–07. The Court therefore finds that the lack of nexus between the alleged harm and the alleged infringement prevents the Court from finding that BoxCast would be irreparably harmed absent an injunction.[10]

Second, BoxCast is only seeking an injunction on new Resi customers since the August, 22, 2021 Pushpay Acquisition. In other words, BoxCast is only seeking to stop a portion of the alleged irreparable harm from Resi's alleged infringement—that which occurred *after* Pushpay

---

[8] BoxCast's contention that it has lost customers to Resi and customers inquired about switching to Resi after the Resi and Pushpay joint video (Dkt. No. 42 at 12) is unpersuasive. Like BoxCast's other contentions on this score, BoxCast fails to explain how this is tied to the alleged infringement. Rather, it demonstrates that BoxCast's alleged harm flows from the Pushpay Acquisition—not Resi's alleged infringement.

[9] The parties disagree about whether survey evidence is required in order to show nexus. Although the Court would have welcomed such evidence, BoxCast's failure to provide a survey or similar evidence does not alone doom its arguments on nexus. Rather, the Court considers and weighs all the evidence before it in order to reach its decision.

[10] As shown above in the Court's traversal of the parties' arguments, both BoxCast and Resi offer significant contradicting evidence on the classification of the market, the market participants, and the size of the market. The Court finds that it need not fully resolve the contradictions in this evidence at this juncture. Even assuming BoxCast's classifications about the market are correct, BoxCast has failed to show a nexus that the harms it will suffer in such a market have a nexus to the alleged infringement. This alone dooms BoxCast's Motion. *Apple*, 678 F.3d at 1324.

acquired Resi.[11]  Despite BoxCast's alleged knowledge of Resi's alleged infringement since 2020 (Dkt. No. 42-1 ¶ 67) and the filing of this case on June 16, 2021, BoxCast never moved to enjoin Resi's alleged infringement until November 2021.  Indeed, it was not until *after* Pushpay acquired Resi did BoxCast finally move to enjoin Resi's conduct.  (Dkt. No. 42).  The Court is persuaded that this evinces a clear attempt by BoxCast to use its pre-existing infringement suit against Resi to effectively halt the Pushpay Acquisition—rather than the alleged infringement—because the Pushpay Acquisition represents a shift in the marketplace that will provide Resi with significantly more resources and capability to compete.  At oral argument, BoxCast argued that "the most direct evidence" that its injunction is not targeted at the Pushpay Acquisition is that Resi "just won't turn off the infringing feature." (Dkt. No. 142 at 17:17–18:8; *see also id.* at 18:1–2 ("[Resi has] refused to turn [the automated scheduling] off, even though they've admitted they could turn it off.")).  The Court finds this unpersuasive.  BoxCast's request for an injunction goes far beyond asking Resi to turn off the allegedly infringing feature—the requested injunction seeks to stop Resi from ***wholly pursuing any new customers*** until after trial.  Further, BoxCast's decision not to seek an injunction on Resi's pre-Pushpay Acquisition sales further supports the conclusion that the alleged harm is not irreparable.  BoxCast has sued Resi for its pre-Pushpay Acquisition alleged infringement, *inter alia*, yet has only moved to enjoin post-Pushpay Acquisition sales.[12]

---

[11] BoxCast also argues that its Motion only seeks an injunction on new Resi customers after the Pushpay Acquisition and that such preserves the pre-Pushpay Acquisition status quo. (Dkt. No. 42 at cover).  The Court finds this argument unpersuasive.  Enjoining Resi's ability to acquire any new customers—and thereby preventing Resi from competing with BoxCast as Resi has done since its inception in 2016—is a significant departure from the status quo.

[12] At oral argument, BoxCast attempted to avoid these realities by stating that it believes the pre-Acquisition harms are irreparable but realized "it's hard to get an injunction," so it sought to "narrow the injunction to the most immediate harm that's threatening us, and that's the harm after the acquisition."  (Dkt. No. 142 at 16:1–3).  The Court finds BoxCast's response unavailing.  A narrow request would simply seek to enjoin Resi from using the allegedly infringing feature (i.e., turn it off).  BoxCast's request is not narrow.  The Court cannot ignore the fact that BoxCast is not seeking to enjoin pre-Pushpay Acquisition conduct simply because BoxCast is seeking a "narrowed injunction." BoxCast's responses on this score further confirm that BoxCast is seeking to stop the Pushpay Acquisition rather than the alleged infringement.  (*See also id.* at 18:9–10 ("[T]his is the straw that broke the camel's back.")).

Accordingly, in light of its failure to seek an injunction on pre-Pushpay Acquisition sales, BoxCast will almost certainly come to trial with a claim for monetary damages for at least said infringement—showing that such damages are calculable.  This is further confirmed by the evidence in the record where BoxCast apparently tracks a number of market metrics, including the cost of lost customers to Resi.  (Dkt. No. 58-1 at 70:20–76:18).  The Court finds that this is also fatal to finding that BoxCast will be irreparably harmed absent an injunction.

### B.      Remaining Factors

The parties also extensively briefed the "likelihood of success on the merits" factor, including the issues of infringement and invalidity.  After considering the briefing, accompanying declarations and testimony, and oral argument, the Court is persuaded that, at this stage, the merits appear to be equally balanced.  Further, during oral argument, the parties acknowledged that the central disputes between them are on the "likelihood of success on the merits" and "irreparable harm factors."  (Dkt. No. 142 at 58:18–59:13).  Given the Court's finding that BoxCast has failed to clearly show it will be irreparably harmed absent an injunction, this is sufficient to deny the Motion.  *Reebok*, 32 F.3d at 1556.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that BoxCast has failed to make the necessary showing that it will suffer irreparable harm absent injunctive relief.  Accordingly, the Motion is **DENIED**.

**So ORDERED and SIGNED this 24th day of March, 2022.**

                                                RODNEY GILSTRAP
                                                UNITED STATES DISTRICT JUDGE